IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

---

USCA Case No. 25-11524-D
United States District Court, Southern District of Florida
Case No.: 1:23-cv-22953-KMM

---

KEVIN COLLAZO,

Plaintiff/Appellee

v.

PROGRESSIVE SELECT INSURANCE COMPANY,

Defendant/Appellant.

---

# PRINCIPAL BRIEF OF APPELLANT PROGRESSIVE SELECT INSURANCE COMPANY

---


KRISTEN M. FIORE, BCS (25766)
**AKERMAN LLP**
201 E. Park Avenue, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 224-9634
Facsimile: (850) 222-0103
kristen.fiore@akerman.com

ANTONIO D. MORIN (187860)
GARY J. GUZZI (159440)
**AKERMAN LLP**
98 SE 7th Street, Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600
Telecopier: (305) 374-5095
antonio.morin@akerman.com
gary.guzzi@akerman.com

*Attorneys for Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE PURSUANT TO FRAP 26.1 AND 11TH CIR. R. 26.1-1

Pursuant to F.R.A.P. 26.1 and 11th Cir. R. 26.1-1, Appellant, PROGRESSIVE SELECT INSURANCE COMPANY, by and through its undersigned counsel, hereby discloses the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock:

1. Akerman LLP (Attorneys for Appellant)
2. Collazo, Kevin (Appellee)
3. Fiore, Kristen (Attorney for Appellant)
4. Guzzi, Gary J. (Attorney for Appellant)
5. Marino Jr., Stephen A. (Attorney for Appellee)
6. Moore, Hon. K. Michael (U.S. District Judge) (S.D. Fla.)
7. Morin, Antonio (Attorney for Appellant)
8. Progressive Direct Holdings, Inc. (Appellant's Parent Corporation)
9. Rocha, Alessia A. (Attorney for Appellee)
10. The Progressive Corporation (Progressive Direct Holdings, Inc.'s Parent Corporation)
11. Ver Ploeg & Marino, P.A. (Attorneys for Appellee)

12. Wimbush, Rochelle N. (Attorney for Appellee)

Appellant Progressive Select Insurance Company ("Progressive") is an indirect, wholly-owned subsidiary of The Progressive Corporation, which is publicly traded on the NYSE under the symbol PGR. No other publicly held corporation owns ten percent (10%) or more of Progressive's stock.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Eleventh Circuit Rules 28-1(c) and 34-3(c), Appellant Progressive Select Insurance Company ("Progressive") requests oral argument. The issue in this appeal is whether the district court erred (1) by allowing the jury to consider evidence of post-Civil Remedy Notice events including (a) additional damages claimed by Appellee Kevin Collazo ("Collazo") that were not known to Progressive at the time it acted upon Progressive's Civil Remedy Notice and (b) the amount of the underlying post-Civil Remedy Notice jury verdict and judgment; and (2) by denying Progressive a new trial on this basis.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ C-1

STATEMENT REGARDING ORAL ARGUMENT ........ i

TABLE OF CONTENTS ........ ii

TABLE OF CITATIONS ........ iv

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUE ........ 2

STATEMENT OF THE CASE ........ 3

*Introduction* ........ 3

*The Accident* ........ 4

*The Insurance Coverage* ........ 4

*The UM Lawsuit* ........ 5

*The Bad Faith Lawsuit* ........ 6

*Standard Of Review* ........ 8

SUMMARY OF THE ARGUMENT ........ 9

ARGUMENT ........ 12

**THE DISTRICT COURT ERRED BY (1) ALLOWING THE JURY—WHEN DETERMINING IF PROGRESSIVE ACTED IN BAD FAITH AT THE TIME THE CRN WAS PENDING—TO CONSIDER EVIDENCE OF POST-CRN EVENTS INCLUDING THE AMOUNT OF THE UNDERLYING POST-CRN JURY VERDICT AND JUDGMENT; AND (2) DENYING THE NEW TRIAL MOTION ON THIS BASIS** ........................................................12

CONCLUSION..........................................................................................34

CERTIFICATE OF COMPLIANCE......................................................................36

CERTIFICATE OF SERVICE .........................................................................36

## TABLE OF CITATIONS

**Page**

**CASES**

*Alexander v. Gov't Emps. Ins. Co.*, No. 3:10-cv-287-J-2JRK,
2012 WL 5382051 (M.D. Fla. Nov. 1, 2012) ..................... 15

*Allstate Indem. Co. v. Ruiz*,
899 So. 2d 1121 (Fla. 2005) ..................... 24, 30-31

*Bell v. Geico Gen. Ins. Co.*,
489 F.App'x 428 (11th Cir. 2012) ..................... 14

*Berges v. Infinity Ins. Co.*,
896 So. 2d 665 (Fla. 2004) ..................... 25

*Brink v. Direct Gen. Ins. Co.*,
38 F.4th 917 (11th Cir. 2022) ..................... 25

*Cadle v. Geico Gen. Ins. Co.*,
838 F.3d 1113 (11th Cir. 2016) ..................... 13

*Chaney v. State Farm Mut. Auto. Ins. Co.*, No. 6:14-CV-1043,
2015 WL 12838839 (M.D. Fla. Dec. 9, 2015) ..................... 17

*Daniels v. Geico Gen. Ins. Co.*,
740 F.App'x 665 (11th Cir. 2018) ..................... 26

*Daniels v. Geico Gen. Ins. Co.*, No. 8:16-cv-00031-MSS-TBM,
2017 WL 6551153 (M.D. Fla. Nov. 1, 2017) ..................... 26

*Duncan v. Geico Gen. Ins. Co.*,
729 F.App'x 900 (11th Cir. 2018) ..................... 14

*Fox Haven of Foxfire Condo. IV Ass'n, Inc. v. Nationwide Mut. Fire Ins. Co.*,
2:13-CV-399-FTM-29CM,
2015 WL 667935 (M.D. Fla. Feb. 17, 2015) ..................... 15

*Kafie v. Northwestern Mut. Life Ins. Co.*, No. 11-21251-CIV,
2011 WL 4499051 (S.D. Fla. Sept. 7, 2011) ..................... 15

*Kafie v. Nw. Mut. Life Ins. Co.*,
834 F. Supp. 2d 1354 (S.D. Fla. 2011) ........................................................ 24, 26

*Koon v. U.S.*,
518 U.S. 81 (1996).................................................................................................9

*Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*,
932 F.3d 1303 (11th Cir. 2019) .............................................................................8

*McGinnis v Am. Home Mortg. Servicing, Inc.*,
901 F.3d 1282 (11th Cir. 2018) .............................................................................9

*Moore v. Geico Gen. Ins. Co.*,
758 F.App'x 726 (11th Cir. 2018) .................................................................. 23, 25

*NBIS Construction & Transport Ins. Servs., Inc. v. Liebherr-America, Inc.*,
93 F.4th 1304 (11th Cir. 2024) ............................................................................ 34

*Peat v. Vanguard Research, Inc.*,
378 F.3d 1154 (11th Cir. 2004) .............................................................................9

*Schafer v. Time, Inc.*,
142 F.3d 1361 (11th Cir. 1998) .............................................................................8

*SEB S.A. v. Sunbeam Corp.*,
148 F.App'x 774 (11th Cir. 2005) .........................................................................9

*Strong v. GEICO*, 8:16-cv-1757-T-36JSS,
2017 WL 11884598 (M.D. Fla. Oct. 13, 2017) ................................................. 15

*Tobin v. Michigan Mut. Ins. Co.*,
398 F.3d 1267 (11th Cir. 2005) ........................................................................... 34

*U.S. v. B.G.G.*,
53 F.4th 1353 (11th Cir. 2022) ..............................................................................9

*Woods v. Progressive Am. Ins. Co.*, No. 19- cv-80517-REINHART,
(S.D. Fla. Aug. 4, 2023)...................................................................... 24, 29, 30

*Wopshall v. Travelers Home & Marine Ins. Co.*,
No. 21-14390-CV-MIDDLEBROOKS,
(S.D. Fla. Mar. 31, 2023) .......................................................... 24, 26, 29

**STATUTES AND CODE PROVISIONS**

28 U.S.C. §1291 ........................................................................................1

28 U.S.C. §1331 ........................................................................................1

28 U.S.C. §1441 ........................................................................................1

28 U.S.C. §1446 ........................................................................................1

§ 624.155, Fla. Stat. ..........................................................3, 5-6, 11, 13, 30, 34-35

§ 624.155(3)(a), Fla. Stat. .........................................................................13

§ 624.155(3)(c), Fla. Stat. .......................................................................3, 5

**RULES AND REGULATIONS**

11th Cir. R. 26.1-1 ...............................................................................C-1

11th Cir. R. 28-1(c)....................................................................................i

11th Cir. R. 32-4 ......................................................................................36

11th Cir. R. 34-3(c)....................................................................................i

Fed. R. App. P. 28.1(e)(2).......................................................................C-1

Fed. R. App. P. 32(f) ...............................................................................36

Fed. R. App. P. 32(a)(5)...........................................................................36

Fed. R. App. P. 32(a)(6)...........................................................................36

Fed. R. App. P. 34(a) ........................................................................................i

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case pursuant to its diversity jurisdiction under 28 U.S.C. §§ 1331, 1441, 1446. *See* [DE[1] at 1-2].

This Court has jurisdiction over Appellant's appeal of the final judgment and related prior orders pursuant to 28 U.S.C. § 1291.

[1] As explained in footnote 2 of this brief, "DE" refers to the docket in the district court case from which this appeal emanates.

## STATEMENT OF THE ISSUE

Whether the district court erred (1) by allowing the jury to consider evidence of post-Civil Remedy Notice events including (a) additional damages claimed by Appellee Kevin Collazo ("Collazo") that had not been incurred or indicated at the time Appellee Progressive Select Insurance Company ("Progressive") acted upon Collazo's Civil Remedy Notice and (b) the amount of the underlying post-Civil Remedy Notice jury verdict and judgment; and (2) by denying Progressive a new trial on this basis.

## STATEMENT OF THE CASE[2]

***Introduction***

This appeal concerns whether a jury in an insurance bad faith case should judge an insurer based upon information the insurer did not and could not have known because it occurred well after the statutorily-mandated 60-day Civil Remedy Notice ("CRN") safe harbor period under section 624.155(3)(c), Florida Statutes. The point of the 60-day safe harbor period is to allow the insurer to cure any alleged bad faith based on the facts and circumstances that were known or should have been known to it during the cure period. Yet, in this case, the district court allowed the jury to consider evidence of post-CRN events such as additional treatment and increased medical expenses as well as the amount of the underlying post-CRN jury verdict and judgment.

Allowing the jury to do so was unfairly prejudicial to Progressive and reversible error because it rendered the statutorily-mandated CRN process meaningless by assessing Progressive's decision to offer less than the policy limits Collazo demanded against facts and circumstances that were not extant at the time Progressive was presented with the opportunity to cure its alleged failure to settle. In essence, admission of post-CRN evidence allowed Collazo to argue for a nearly

---

[2] This brief cites to district court docket entries by .pdf page number (*e.g.* [DE 1 at 1] refers to .pdf page 1 of docket entry 1).

strict liability standard by asking the jury to compare post-CRN evidence with Progressive's CRN response when the case was in a wholly different posture. This deprived Progressive of its right to the concomitant statutorily-mandated safe-harbor cure period. This is impermissible under Florida law.

***The Accident***

On June 27, 2019, Collazo was driving his vehicle in Miami Dade County, Florida. [DE 1-3 at 3] A vehicle driven by Faris Hillaire struck the rear of Collazo's vehicle, in what the evidence established was a fairly minor impact (the "Accident"). [DE 1-3 at 3; DE 3 at 5; DE 42 at 1] Collazo alleged he hurt his neck and back in the Accident. [DE 42 at 4-5]

***The Insurance Coverage***

At the time of the Accident, the tortfeasor, Hillaire, had $10,000 bodily injury coverage under his own automobile liability policy. [DE 123-1 at 106:13-15; DE 123-1 at 147:19-22] Collazo was insured by Progressive with uninsured/underinsured ("UM") limits in the amount of $100,000. [DE 92-1] Collazo asserted a bodily injury claim against Hillaire, which claim was settled for $10,000. [DE 123-1 at 106:13-15; DE 123-1 at 147:19-22]

After submitting his UM claim to Progressive, Collazo filed a CRN on August 26, 2020, demanding that Progressive pay its UM limit of $100,000 to settle the claim. [DE 92-13] In that critical timeframe, the medical information provided to

Progressive showed that Collazo obtained cervical and lumbar ablations with what appeared to Progressive to be grossly-inflated bills of $115,000 for one procedure which constituted nearly 90% of the bills submitted. [DE 92-9 at 3-7; DE 123-1 at 120:16-20] The medical information demonstrated that Collazo's complaints of pain were greatly diminished, enabling him to return to his daily activities, with no additional procedures/treatments recommended or scheduled. [DE 92-9 at 10-12; DE 123-1 at 118:4 – 119:7]

During the 60-day CRN safe harbor period under section 624.155(3)(c), Florida Statutes, Progressive offered Collazo $44,200 based on the extant medical records and information. [DE 92-10]

***The UM Lawsuit***

Immediately after the expiration of the 60-day CRN safe harbor period, Collazo sued Progressive in Florida state court in October 2020 for UM benefits (Count I) and unfair claims practices/bad faith under section 624.155, Florida Statutes (Count II) (the "UM Lawsuit"). [DE 1-5 at 7-15] Progressive removed the UM Lawsuit to federal district court. [DE 1]

**<u>Four months after</u>** the 60-day CRN safe harbor period expired and the filing of the UM Lawsuit, Collazo began treatments again, underwent a cervical spine surgery and received a recommendation for a lumbar surgery, which more than doubled his medical expenses and therefore drastically increased his UM claim value

[DE 92-22; DE 123-1 at 84:21-85:3; 121:6-122:10; 122:23-124:2; 281:7-10]—**none of which was known by, suggested to, or even hinted to Progressive during the CRN safe harbor period** [DE 123-1 at 201:17-202:4; 202:23-203:7]. Immediately upon learning of Collazo's additional damages and surgical recommendations in June 2021, Progressive offered Collazo the UM policy limits of $100,000. [DE 123-1 at 201:7-16] Collazo rejected that offer. [DE 123-1 at 124:12-16]

Because Collazo refused to settle his claim after the CRN expired, the UM Lawsuit proceeded to trial. At trial, Collazo presented evidence of post-CRN medical treatment, including his cervical surgery and recommendation for a future lumbar surgery. [DE 92-22; DE 123-1 at 84:21-85:3; 121:6-122:10; 122:23-124:2; 281:7-10]

The jury returned a verdict in favor of Collazo in the amount of $844,220.18. [DE 92-15] The district court, after applying collateral source setoffs, ultimately entered an amended final judgment in favor of Collazo for $834,220.18. [DE 1-3 at 4]

***The Bad Faith Lawsuit***

Collazo then sued Progressive in Florida state court for statutory bad faith under section 624.155 (the "Bad Faith Lawsuit"). [DE 1-3] Collazo alleged that Progressive acted in bad faith by failing to settle his claim for UM benefits in response to his August 26, 2020 CRN. [*Id*.]

That allegation ignores the drastic discrepancy in facts that affected the claim value during the CRN safe harbor period and the subsequent additional damages evidence presented to the jury upon which the verdict was based. Progressive moved *in limine* to preclude evidence of post-CRN events, damages, and the amount of the UM Lawsuit verdict (the "Motion *in Limine*"). [DE 44] The post-CRN facts and verdict were irrelevant to whether Progressive acted in good faith **during the CRN safe harbor period** because they were not in existence and Progressive could not have considered them. [*Id*.] Thus, that evidence carried no probative value as to whether Progressive could have and should have settled in response to Collazo's CRN. [*Id*.]

The district court denied Progressive's Motion *in Limine* [DE 72] and denied Progressive's standing objection to the admission of this evidence at trial [DE 123-1 at 4:17-5:2].

Progressive also requested proposed special jury instructions providing the jury with an understanding of the entitlement to recovery of medical expenses and the determination of permanency and calculation of pain and suffering/non-economic damages under Florida law. [DE 80 at 37, 39] These issues were central to the valuation dispute giving rise to the bad faith claim and were critical to providing the jury with an appropriate framework to understand the decisions made

by Progressive during the relevant CRN safe harbor period. The district court denied Progressive's requested instructions. [DE 123-2 at 7:10-19]

The jury returned a verdict in favor of Collazo, finding that Progressive acted in bad faith by failing to settle Collazo's UM claim when it could have and should have done so. [DE 88] The court entered judgment in favor of Collazo (the "Bad Faith Judgment"). [DE 91; DE 108]

Progressive timely filed a motion for new trial (the "New Trial Motion"). [DE 97] Progressive argued the district court erred when it (1) allowed the jury to consider evidence of post-CRN events and the amount of the underlying post-CRN jury verdict; and (2) refused to give Progressive's requested jury instructions. [*Id.*]

Collazo filed a response [DE 101] and Progressive filed a reply [DE 104]. The district court denied the New Trial Motion. [DE 115]

This appeal followed.

***Standard Of Review***

Typically the Court reviews for abuse of discretion a district court's ruling on a motion *in limine*. *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1311 (11th Cir. 2019). However, where the district court's ruling on a motion *in limine* is based on a legal conclusion, the Court's review is de novo. *See U.S. v. Thompson*, 25 F.3d 1558, 1563 (11th Cir. 1994); *see also Schafer v. Time, Inc.*, 142 F.3d 1361, 1370 (11th Cir. 1998) ("We review the district court's legal decision to

apply a particular rule of evidence de novo but its decision to admit or exclude particular evidence under that rule for an abuse of discretion.”).

The Court “review[s] a district court’s decision to deny a new trial for abuse of discretion.” *McGinnis v Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1291 (11th Cir. 2018). To grant a new trial based on an erroneous evidentiary ruling, a party must show that the ruling produced a substantial prejudicial effect. *SEB S.A. v. Sunbeam Corp.*, 148 F.App’x 774, 790 (11th Cir. 2005). “[T]he inquiry is always directed to the same central question—how much of an effect did the improperly admitted or excluded evidence have on the verdict.” *Peat v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004).

“A district court by definition abuses its discretion when it makes an error of law.” *U.S. v. B.G.G.*, 53 F.4th 1353, 1360 (11th Cir. 2022) (quoting *Koon v. U.S.*, 518 U.S. 81, 100 (1996)). “In other words, a district court cannot properly exercise its discretion where it is ‘guided by erroneous legal conclusions.’” *Id*. (quoting *Koon*, 518 U.S. at 100).

## SUMMARY OF THE ARGUMENT

The district court’s decision to permit the jury to judge Progressive’s actions on subsequent information rather than what it knew at the critical time of the CRN safe harbor period was prejudicial error and requires a new trial. Any evidence of what occurred after October 26, 2020 (the date the CRN safe harbor period expired)

including the judgment based upon that additional evidence was irrelevant, or to the extent it was marginally relevant, was outweighed by the prejudicial effect of allowing a jury to apply those facts to its determination of Progressive's actions. The introduction of such evidence essentially gave the jury 20/20 hindsight which Progressive did not have when it made its decisions at the time of the CRN.

While the existence of an excess verdict is relevant so far as enabling the insured to sue for bad faith, neither the **amount** nor post-CRN evidence is relevant, because Collazo's ability to recover the amount of the underlying UM verdict exceeding the UM limits as bad faith damages is established by section 627.727, Florida Statutes, and the jury in this case did not need to (and did not) make any damage determinations.

The only issue the district court should have allowed the jury to consider is whether Progressive acted appropriately with respect to information known **before** expiration of the 60-day CRN safe harbor period. Any subsequent information is beyond the scope of the CRN statute since it necessarily did not exist at the time the CRN was pending and neither Progressive nor a jury could know such information.

Moreover, because the underlying verdict amount was driven by post-CRN medical procedures and damages, which were drastically different from the procedures and damages presented to Progressive during the CRN safe harbor period, it was improper for the jury to consider this evidence and the jury's

consideration of such evidence caused unfair prejudice to Progressive. Instead of arguing why it acted in good faith with respect to settlement decisions based on the facts and circumstances then in existence, Progressive was forced to introduce evidence and present argument to explain why the 2022 underlying verdict greatly exceeded its 2020 valuation and settlement decisions. Allowing the jury to engage in 20/20 hindsight and forcing Progressive to defend a verdict once the opportunity to settle had passed is not the proper standard to judge an insurer's actions.

Because this issue is strictly one of Florida law, there is no Florida appellate decision directly on point, and it is a far too common abuse of the system in insurance bad faith cases, Progressive respectfully requests that the Court certify a question to the Florida Supreme Court on this issue. Progressive suggests the following question for certification:

Is evidence of events that occur post expiration of a Civil Remedy Notice, including a verdict, admissible in insurance bad faith actions concerning an uninsured/underinsured motorist insurer's alleged failure to settle under section 624.155(1)(b)1., Florida Statutes?

## ARGUMENT

**THE DISTRICT COURT ERRED BY (1) ALLOWING THE JURY—WHEN DETERMINING IF PROGRESSIVE ACTED IN BAD FAITH AT THE TIME THE CRN WAS PENDING—TO CONSIDER EVIDENCE OF POST-CRN EVENTS INCLUDING THE AMOUNT OF THE UNDERLYING POST-CRN JURY VERDICT AND JUDGMENT; AND (2) DENYING THE NEW TRIAL MOTION ON THIS BASIS.**

By admitting evidence of post-CRN events and the underlying verdict and judgment, Collazo was permitted to juxtapose an August 2020 evaluation and a $44,200 offer with a July 2022 $844,000 verdict and judgment. By permitting such, the district court erred and denied Progressive a fair trial as there was no way the jury could fairly and impartially consider whether Progressive acted in bad faith by not agreeing to offer the $100,000 UM limits in 2020. The jury was tainted with subsequent information and could therefore compare a 2022 verdict to the policy limits and conclude Progressive must have acted in bad faith.

However, that is not the standard by which an insurer should be judged when it rejects a CRN. An insurer should be judged based upon the information it knew at the time the CRN was pending as any subsequent event, evidence, or judgment is irrelevant to the critical point in time. The jury should not have examined Progressive's decisions against the backdrop of what eventually was presented and assessed months and years later after expiration of the CRN when Progressive's opportunity to settle was extinguished. Only a new trial can cure the unfair prejudice

to Progressive caused by the admission of post-CRN evidence and the underlying verdict amount.

A claim for first-party bad faith exists only by statute, *i.e.*, section 624.155, Florida Statutes. The filing of a CRN with the Florida Department of Financial Services is a condition precedent to maintaining an action for statutory bad faith under section 624.155. *See* § 624.155(3)(a), Fla. Stat. The CRN process provides the insurer with a 60-day period to remedy the alleged statutory violation and no statutory bad faith action "shall lie if, within 60 days after the insurer received notice…the damages are paid or the circumstances giving rise to the violation are corrected." § 624.155, Fla. Stat. Moreover, section 624.155 provides that the required CRN is to "state, with specificity" the statutory provision(s) allegedly violated and the "facts and circumstances giving rise to the violation." *Id*.

Consistent with this statutory scheme and the 60-day safe-harbor period associated with the CRN process, the relevant time period when assessing whether an insurer acted in bad faith is the 60-day CRN safe-harbor period (and the insurer's decisions in that period) and the insurer's decision based upon the facts and circumstances extant at that time. *Cadle v. Geico Gen. Ins. Co.*, 838 F.3d 1113, 1126 (11th Cir. 2016) (holding that insured's statutory bad faith claim against UM insurer based on UM insurer's alleged failure to consider non-economic damages for insured's alleged permanent injury required insured to establish she had

demonstrated existence and permanency of her injury during 60-day CRN period); *see also Duncan v. Geico Gen. Ins. Co.*, 729 F.App'x 900, 902 (11th Cir. 2018) ("Given the lack of evidence presented to GEICO during the sixty day cure period indicating that Duncan suffered a permanent injury within a reasonable degree of medical probability, GEICO was not unreasonable in offering him $1,500 to settle his UM claim…"). The point of the 60-day safe harbor period is to allow the insurer to cure any bad faith based on the facts and circumstances that were known or should have been known to it during the cure period.

Here, however, Progressive was forced to defend its claims handling both during and after the safe-harbor period, and counter allegations and evidence of drastically different facts that were not even in existence during the safe-harbor period. Thus, the district court's allowance of post-CRN evidence and the amount of the underlying verdict and judgment rendered the safe-harbor period essentially meaningless and constitutes reversible error.

Indeed, this Court and several district courts have routinely concluded that an insured cannot establish a claim for statutory bad faith based upon events or conduct occurring after the 60-day CRN cure period because it would be impossible for an insurer to remedy conduct or circumstances that have not yet occurred. *See, e.g.*, *Bell v. Geico Gen. Ins. Co.*, 489 F.App'x 428, 432 (11th Cir. 2012) (concluding bad faith claim failed because CRN did not provide insurer notice as to how it could have

possibly remedied the situation, even though plaintiff did not learn of problem until after filing of CRN); *Kafie v. Northwestern Mut. Life Ins. Co.*, No. 11-21251-CIV, 2011 WL 4499051, at *11 (S.D. Fla. Sept. 7, 2011) (rejecting plaintiff's argument that a "single CRN encompasses all later bad faith conduct" and holding plaintiff was precluded from pursuing bad faith claims based on misrepresentations allegedly made by insurer that occurred **after** filing of plaintiff's civil remedy notice); *Fox Haven of Foxfire Condo. IV Ass'n, Inc. v. Nationwide Mut. Fire Ins. Co.*, 2:13-CV-399-FTM-29CM, 2015 WL 667935, at *5 (M.D. Fla. Feb. 17, 2015) (granting partial summary judgment for insurer and holding that "an insured cannot establish bad faith via insurer conduct that occurred after the CRN's 60-day cure period"); *Alexander v. Gov't Emps. Ins. Co.*, No. 3:10-cv-287-J-2JRK, 2012 WL 5382051, at *3 (M.D. Fla. Nov. 1, 2012) (same); *Strong v. GEICO*, 8:16-cv-1757-T-36JSS, 2017 WL 11884598, at (M.D. Fla. Oct. 13, 2017) (same).

Collazo filed his CRN on August 26, 2020 demanding the payment of the Progressive Policy's $100,000 UM limits. [DE 92-13] The CRN expired on October 26, 2020. Before the CRN expired, Progressive made an offer of $44,200 based upon the medical records and information available at that time. [DE 92-10] Those records and that information revealed that Collazo obtained cervical and lumbar ablations in May 2020 and that his last visit with a medical provider on July 29, 2020 indicated that Collazo's complaints of pain had greatly diminished (he described his pain level

as 1 out of 10), he was not requiring any pain medication, was returning to his normal daily activities, and that no additional procedures or treatment were scheduled or recommended. [DE 92-9 at 3-7; DE123-1 at 120:16-20]

The key reason why the district court should have excluded post-CRN evidence, including Collazo's surgeries and the amount of the underlying jury verdict and judgment, is because the post-CRN period presented a drastically different case and claim exposure than what was known or available to Progressive during the CRN period when Progressive could have potentially settled Collazo's claim. **Four months after** the CRN expired and after Collazo filed his suit against Progressive, Collazo began treating again and immediately underwent a cervical spine surgery and received a recommendation for a lumbar surgery, which significantly increased the claim value. During the CRN period, there was **no** indication of any recommendation for a cervical or lumbar surgery, and the evidence presented to Progressive at that time was that Collazo's pain level was minimal and that he was resuming regular activities. [DE 123-1 at 119:4-12; 121:6-11; 122:23-123:18]

The jury in this case was not tasked with determining the amount of bad faith damages. Rather, the amount of those damages is set by Florida statute to correspond to the amount of the underlying verdict. Accordingly, the **amount** of that verdict was not relevant because there was nothing the jury needed to do with that number.

Simply put, whether that underlying jury verdict was ultimately $7,000, $70,000, or $700,000 higher than the UM limit of Collazo's policy, the number had no bearing on the bad faith inquiry. Even if Collazo obtained a verdict in the UM Lawsuit barely exceeding the UM limits, he would have been able to bring a bad faith case under Florida law. Moreover, the evidence was also irrelevant because it was undisputed that Collazo was unwilling to accept the policy limits once he filed suit within days of the expiration of the CRN (and the safe harbor period). Indeed, as noted by Collazo's counsel at a sidebar conference: "The testimony was that once the lawsuit was filed, Mr. Collazo was no longer willing to take the 100k limit. So, when they tender is really irrelevant at this time point. It is academic." [DE 123-1 at 272:25-273:3]; *see Chaney v. State Farm Mut. Auto. Ins. Co.*, No. 6:14-CV-1043, 2015 WL 12838839, *2 (M.D. Fla. Dec. 9, 2015) (granting State Farm's motion *in limine* as there was no causal connection between failures alleged by plaintiff and excess judgment).

Even if the evidence of the underlying jury verdict and judgment had any marginal relevance, admitting into evidence the amount of the underlying judgment and verdict was unfairly prejudicial to Progressive **in this case** because it would, and did, lead the jury to juxtapose (1) Progressive's 2020 and earlier settlement offers that were based on the information available at the time when settlement was possible with (2) a verdict that was based on significantly-increased and different

medical damages based on procedures that took place and were recommended long after Progressive's settlement opportunity expired. The underlying verdict reflects that jury's consideration of a cervical spine surgery that Collazo underwent, future medical expenses that included a lumbar surgery that was not recommended before expiration of the CRN safe-harbor period, and significant medical expenses that Collazo incurred **after** the settlement opportunity expired, and which were **unknown** to Progressive at the time it acted in response to the $100,000 demand in the CRN. [DE 123-1 at 123:23-124:2]

Indeed, once the district court allowed this improper, irrelevant, and prejudicial evidence to come in, the thrust of Collazo's case predictably shifted from proving whether Progressive's offers were made in bad faith given the information Progressive had **at the time**, to how the jury in the underlying UM case came to award him the excess verdict:

> Now, at the time that he gets to trial, Mr. Collazo has incurred over $250,000 in medical bills for his treatment for his progression of surgery, et cetera . . . . They gave him an award of about $845,000. **So, what you are going to be asked to do here is evaluate the process by which we got to a verdict that is over eight times the amount of the policy limits**.

[DE 123-1 at 53:14-16; 54:7-10 (emphasis added)]

This very argument is contrary to Florida law that essentially freezes in time what the insurer knew at the time of the CRN for a jury to later judge if it acted appropriately with that information. In addition to Collazo's emphasis during

opening argument on this irrelevant and unfair comparison of Progressive's 2020 CRN evaluation and the 2022 verdict, Collazo's counsel elicited testimony from Collazo and his underlying counsel in the UM Lawsuit regarding the post-CRN progress of his treatment, injuries, and the jury's ultimate damages determination.

For example, Collazo's counsel elicited testimony from Collazo on direct examination regarding his worsening condition and return to his treating physician for additional treatment months **<u>after</u>** the expiration of the CRN and Progressive's opportunity to settle the UM claim for the $100,000 UM limits:

> Q. So a few months went by where you were feeling good, and then you were in pain again?
> A. That is correct.
> Q. And, what did you do after that?
> A. I went back to the surgeon and/or the Florida Spine and Joint and explained my symptoms, and they did, I believe, a second MRI, and that is when they referred me, or we started talking about surgery.
> Q. And so your doctor recommended you proceed with surgery because the conservative care was not working; is that fair?
> [objection and court ruling omitted]
> A. That is correct. We have exhausted all the conservative care, chiropractor first, then the nerve blocks, the ablation, and now we are going to surgery.
> Q. And, you were still in pain?
> A. At the time, yes.

[DE 123-1 at 84:21-85:13]

Collazo also testified regarding the amount of the underlying verdict and judgment:

> Q. Did the lawsuit eventually result in a jury trial?
> A. It did, yes.
> Q. And, what was the result of the jury trial?
> A. It was a jury verdict in the amount of $844,000.
> Q. So an amount over eight times your policy limits with Progressive?
> A. That's correct.
> Q. Did the jury determine that you had a permanent injury?
> A. They did, yes.
> Q. Did the jury determine that your permanent injury was caused by the June 27, 2018, auto accident?
> A. They believed so, yes.
> Q. Did the jury determine that you were entitled to all of your past medical expenses amounting to roughly $252,000?
> A. That's correct.
> Q. And did the jury determine that you were also entitled to future medical expenses?
> A. That's correct.
> Q. And past pain and suffering?
> A. That's correct.
> Q. And future pain and suffering?
> A. That's correct.
> Q. And the total damages that the jury awarded you, I think you testified was in the amount of $844,000 and some change; is that correct?
> A. That is correct.

[DE 123-1 at 86:23-87:23]

Collazo continued to make the amount of the underlying verdict and judgment a feature of his case in chief by examining Progressive's corporate representative and Collazo's underlying counsel (Attorney Jorge Garcia) regarding the amounts awarded by the jury:

**Collazo's Examination of Progressive's Corporate Representative**

Q. And, in fact, they [the jury] said, "And you are going to need $150,000 more in future medicals." Right?
A. That's what it says on the verdict form.
Q. Past pain and suffering of over a quarter million dollars, and also future pain and suffering, for a grand total of $844,220.18. To date, how much of this verdict amount has Progressive paid?
[objection omitted]
A. Well, we would have paid at a minimum his policy limits. So, we would have paid him his hundred thousand dollars policy limits.
Q. So, now that he finally has a judgment for eight times the policy limits, then Progressive paid the benefits that he had purchased years before? True?
A. Well, we – we said we would pay it. They just wouldn't take it before the verdict, just to be clear.

[DE 123-1 at 173:8-174:1]

**Collazo's Examination of Attorney Jorge Garcia**

Q. Is this the verdict form that was achieved at that trial?
A. Yes.
Q. And, can you tell us what the jury awarded Mr. Collazo for his past medicals?
A. So, the jury awarded $252,000.18 for his past medical expenses.
Q. And what did the jury award for his future medicals?
A. $150,000 – sorry, $150,500.
Q. And did the jury determine that Mr. Collazo had sustained a permanent injury as a result of the crash?
A. It did.
Q. What did the jury award Mr. Collazo for his past pain and suffering?
A. It awarded $274,150.

> Q. And what was the amount of the award for future pain and suffering?
> A. $167,507.
> Q. And, the total damages awarded to Mr. Collazo, can you tell us what the amount was?
> A. $844,220.18.
> Q. And, the final judgment was ultimately entered upon this jury verdict, right?
> A. Correct.

[DE 123-1 at 235:9-236:6]

In closing argument, Collazo again emphasized to the jury the difference between Progressive's evaluation and offers and the ultimate amount awarded by the underlying jury:

> And you have seen the verdict form from when the jury had to decide was there an amount that was going to be owed by an underinsured motorist to Mr. Collazo?
>
> I will show it to you again in a minute, but you have seen it several times. The answer is yes, and that amount is $844,000 – a lot more than the $100,000 policy limits.

[DE 123-2 at 124:24-125:4]

> Except what you know is that a jury sat down and reevaluated this and said, "Actually, no. That's what his claim is worth – actually, no. You are off by about a factor of eight. You are off by a factor of eight. So, that $70,000 evaluation should have been $240,000. That $25,000 evaluation should have been $200,000.

[DE 123-2 at 132:24-133:4]

Collazo's argument at the bad faith trial sought a strict liability standard against an insurer if an excess verdict is returned. There is no such standard in

Florida and certainly not with respect to how an insurer responds to a CRN. In short, allowing Collazo to introduce the underlying judgment and verdict was not only legally improper, but also caused substantial unfair prejudice to Progressive by inviting the jury to compare Progressive's valuation and settlement decisions in 2020 with a jury's ultimate assessment of Collazo's damages and injuries two years later **based on drastically different information than that available to Progressive**. *See, e.g, Moore v. Geico Gen. Ins. Co.*, 758 F.App'x 726, 731-32 (11th Cir. 2018) (holding that district court correctly excluded evidence on Rule 403 grounds in bad faith failure to settle action regarding claimant's settlement of same claim with different insurer where claim settled by other insurer "was not identical nor even substantially similar to the claim GEICO was handling").

In addition, the admission of the amount of the underlying verdict was unfairly prejudicial to Progressive because the jury was essentially invited, by virtue of that evidence, to apply a strict liability standard incompatible with the standard governing the determination of whether Progressive acted in bad faith by failing to settle Collazo's UM claim. In essence, the jury was invited to conclude that because the underlying verdict greatly exceeded Progressive's valuation and settlement offer years before the verdict, Progressive's valuation must have been in bad faith.

Given the **significant** monetary discrepancy between Collazo's medical treatment up to and during the settlement opportunity and the ultimate post-CRN

surgeries that drastically increased the value of the claim, the jury was essentially invited to give greater weight to Collazo's post-CRN treatments.

By admitting the underlying judgment and verdict, the district court further compounded the unfair prejudice by forcing Progressive to explain to the jury why the verdict was driven by completely different factors than what Progressive knew or could have known at the time of the settlement opportunity. Thus, instead of putting on a defense regarding its decisions during the CRN period based on the information that was available at that time, Progressive was forced to explain how and why the additional significant expenses incurred by Collazo in the post-CRN period drove the high excess verdict in the underlying UM case.

Because of the improper evidence and argument the district court allowed, the only cure for the unfair prejudice that Progressive suffered is a new trial.

The district court cited the "totality of the circumstances" standard to suggest that post-CRN conduct is **per se** admissible or otherwise immune from a Rule 403 analysis. [DE 72 at 6; DE 115 at 3-4 (citing *Allstate Indem. Co. v. Ruiz,* 899 So. 2d 1121, 1129-30 (Fla. 2005); *Kafie v. Nw. Mut. Life Ins. Co.,* 834 F. Supp. 2d 1354, 1367 (S.D. Fla. 2011); *Woods v. Progressive Am. Ins. Co.,* No. 19- cv-80517-REINHART, ECF No. 196 at 2 (S.D. Fla. Aug. 4, 2023) ([DE 52-2]); *Wopshall v. Travelers Home & Marine Ins. Co.,* No. 21-14390-CV-MIDDLEBROOKS, ECF No. 122 at 26 (S.D. Fla. Mar. 31, 2023); ([DE 52-1]))] This is incorrect.

Progressive agrees the overarching standard for measuring bad faith under Florida law is the "totality of the circumstances." *Brink v. Direct Gen. Ins. Co.*, 38 F.4th 917, 926 (11th Cir. 2022) (citing *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004)). Contrary to the district court's conclusion, however, the "totality of the circumstances" standard does not establish a *per se* admissibility standard for all facts and circumstances without regard to when those facts and circumstances were present (or presented) relative to an insurer's alleged opportunity to settle. Instead, in the context of a statutory bad faith action which requires that the insurer be provided a CRN and a 60-day safe harbor to cure the statutory violation(s) alleged in the CRN based upon the facts and circumstances extant at the time of the CRN, only those facts and circumstances extant through the expiration of the CRN are potentially relevant. It is the totality of the circumstances up to the time of expiration of the CRN that is relevant.

This is because, as in this case, the settlement opportunity presented to Progressive existed only through expiration of the CRN and, therefore, **by definition**, facts and circumstances that occurred after expiration of the CRN could not have formed the basis for the statutory violation alleged in the CRN and could not have been considered by Progressive in responding to the settlement opportunity presented by the CRN. *See* Fed. R. Evid. 402, 403; *Moore*, 758 F.App'x at 731-33 (affirming trial court's exclusion of evidence on 403 grounds in plaintiff's action for

bad faith failure to settle). The cases the district court relied upon for this point are inapposite. None support the proposition that evidence of an insurer's post-CRN conduct is relevant and admissible under the totality of the circumstances standard.

First, relying on *Kafie* for the proposition that an insurer's post-CRN litigation conduct is *per se* relevant and admissible is unavailing. The Court rejected that proposition in *Daniels v. Geico Gen. Ins. Co.*, 740 F.App'x 665, 669-71 (11th Cir. 2018); *see also Daniels v. Geico Gen. Ins. Co.*, No. 8:16-cv-00031-MSS-TBM, 2017 WL 6551153, *6 (M.D. Fla. Nov. 1, 2017) ("Plaintiff appears to argue that the question of whether Geico acted in bad faith by refusing to tender the UM limits during the CRN Cure Period is not centered on the information Geico possessed or knew during that relevant time period when making the determination. Plaintiff relies on [*Kafie*]. This reliance is misplaced.") (internal citation omitted).

Second, the district court misinterpreted *Wopshall* by overlooking the facts Judge Middlebrooks considered in reaching his conclusion. In particular, Judge Middlebrooks' decision was informed by the alleged failure of the insurer to evaluate and pursue potential settlement for the UM limits **after** expiration of the 60-day cure period. [DE 52-1] Significantly, Judge Middlebrooks noted that the insurer was on notice that the plaintiff's health issues identified in the CRN were ongoing, the plaintiff's condition was deteriorating, the plaintiff underwent the medical procedures comprising the post-CRN evidence **before** expiration of the 60-day CRN

cure period, the medical records provided to the insurer after expiration of the CRN cure period reflected a continuation of treatment of which the insurer was already aware, and plaintiff provided the post-CRN medical records to the insurer to provide the insurer with an additional opportunity to settle:

> Plaintiff's February 2, 2018 letter was a continuation of Plaintiff's ongoing effort to provide supplemental medical records to Defendant that was relevant to the value of her original claim. The supplemental information that Plaintiff provided demonstrated Plaintiff's deteriorating health in support of her original uninsured motorist claim.
>
> * * *
>
> Defendant's awareness of the CRN and the conduct on which it was based did not change as a result of Plaintiff's later-submitted medical records (on top of the records that she had already submitted prior to the expiration of the cure window). **<u>Defendant had reason to believe that Plaintiff's health issues were ongoing, and that Plaintiff could have permanent injuries that could result in future medical procedures</u>**. While Plaintiff continued to submit medical records of procedures that took place on December 19, 2017, the medical procedures took place on December 5, 2017, before the expiration of the CRN. Defendant learned as early as October 19, 2017, when Ms. Schobel sent Defendant an email containing Plaintiff's updated medical records, showing evidence of Plaintiff's worsening medical condition or even as early as July 7, 2017, when Defendant evaluated Plaintiff's claims and saw that she had potential continuing injuries. The medical records and bills that Plaintiff provided to Defendant in February 2018 do not constitute new allegations worthy of a second CRN. Instead, Plaintiff continued to submit records regarding an event that Defendant was already well aware of to further confirm Plaintiff's additional medical needs.
>
> * * *

> After the 60-day CRN window lapses, the insurer must continue to act in good faith, but it loses the "safety net" which the cure period affords. There may still be a presumption of bad faith. In the circumstances here, Plaintiff was effectively providing Defendant with an *additional* opportunity to settle on top of the 60 days that is statutorily enforced.[3]
>
> * * *
>
> Fn3: I note, however, that whether Plaintiff would have accepted a settlement offer at the expiration of the CRN date is in dispute.

[DE 52-1 at 11-13 (bold and underline emphasis added; italicized emphasis in original)]

The facts here are entirely opposite. Here, it is undisputed Collazo's post-CRN medical records and treatment, *i.e.*, the cervical spine surgery and lumbar surgery recommendation, were neither indicated nor recommended **<u>before</u>** expiration of the CRN cure period. Further, the status of Collazo's condition and medical treatment immediately before and during the CRN cure period did not reflect a deteriorating condition. Instead, the extant medical records reflected that Collazo was resuming normal activities, not requiring any pain medication, had minimal complaints of pain (reported as 1 out of 10), and had no pending recommendations for any surgical procedures. [DE 92-9 at 3-7; DE123-1 at 120:16-20] Lastly, there was no claim or evidence that there was an opportunity to settle for the UM policy limits once the CRN cure period expired; it was undisputed that Collazo was unwilling to accept the

limits of the Progressive UM policy once he filed suit within days of the expiration of the CRN cure period.

Third, the district court's reliance on Magistrate Judge Reinhart's order in *Woods* is similarly unconvincing. The *Woods* order itself does not provide an analysis but simply refers to the reasons offered in opposition to the motion *in limine* by the plaintiff. [DE 52-2 at 2] Tellingly, the plaintiff in *Woods* argued in opposition to the insurer's motion *in limine* that evidence beyond the CRN cure period was relevant and admissible because the plaintiff would have accepted the UM limits up until March 5, 2020—more than two years **after** the CRN(s) filed by the plaintiff. [DE 104 at 4 (citing *Woods*, ECF No. 156, at ¶ 23; ECF No. 178 at 11)]; not so here as counsel admitted [DE 123-1 at 272:25-273:3].

Therefore, neither Judge Middlebrooks nor Judge Reinhart concluded that post-CRN evidence was ***per se*** admissible. Instead, Judge Middlebrooks and Judge Reinhart determined that certain post-CRN evidence was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice based on the particular facts presented by those claims, most notably that the opportunity to settle extended beyond the expiration of the CRN safe harbor time period. Because the facts presented by the claims in *Wopshall* and *Woods* are distinguishable from the facts presented by Collazo, neither *Wopshall* nor *Woods* compels or supports the admission of post-CRN evidence here.

In fact, in *Woods*, Judge Reinhart **excluded** evidence of the amount of the underlying verdict and judgment at trial notwithstanding his initial denial of Progressive's motion *in limine*. Judge Reinhart reasoned that **the amount of the verdict was irrelevant to the issue of whether Progressive acted in bad faith in failing to settle the plaintiff's UM claim**:

> Court:[H]ow the jury got to its verdict, to me, is irrelevant.
>
> All that's relevant is what – not even what the verdict was. It was that it was a verdict in excess of the policy limit, because that is an element. And like I said, the amount of the verdict is relevant to the damages, if we get there. But that's for me, not for this jury.
>
> The only issue, as I understand it, for this jury is what was Progressive's state of mind, for lack of a better way to phrase it. Did they act in good faith or bad faith? What flows from that are issues the court will resolve later. If I think forward - I think this was – the proposed jury verdict form you sent me had one question: Did Progressive act in good faith or bad faith? That's it. So that's where we are going.

[DE 104 at 9-10 (citing *Woods*, ECF No. 228 (Tr. Tran. at 22:5-18)] That is precisely what the district court should have done here.

Finally, *Ruiz* does not support the district court's conclusion that post-CRN evidence is *per se* admissible. [DE 72 at 6] *Ruiz* concerned the obligation of insurers in first-party bad faith cases to produce certain information in discovery; it had nothing to do with post-CRN evidence:

> Consistent with the analysis outlined, we hold that in connection with evaluating the obligation to process claims in good faith under section 624.155, all materials, including documents, memoranda, and letters, contained in the underlying claim and related litigation file material that

> was created up to and including the date of resolution of the underlying disputed matter and pertain in any way to coverage, benefits, liability, or damages, should also be produced in a first-party bad faith action.

899 So. 2d at 1129-30. Here, there is no allegation that Progressive did not comply with its discovery obligation. It did. And nothing in *Ruiz* exempts the admissibility of post-CRN evidence from a Rule 402 and 403 analysis.

Importantly, the district court's admission of post-CRN evidence was not harmless error as Collazo asserted below [DE 101 at 10-12], and which Progressive anticipates Collazo will argue on appeal. First, Collazo's characterization that the medical information available to Progressive during the CRN period established that Collazo's medical billing exceeded the Policy's UM limits [*Id*.] completely overlooked the fact that the evidence presented reflected that the vast majority of that billing was attributable to a non-surgical procedure that was estimated (by Collazo's own treating provider) to cost $35,000 rather than the nearly $120,000 invoiced by Collazo's providers (and for which Collazo was never billed) [DE 123-1 at 267:8–269:2] Moreover, Progressive presented evidence that it considered all the medical bills submitted, and valued the aforementioned billing based upon available medical billing resources and the experience of its adjusters with respect to the reasonable and customary charges for the procedures at issue. [DE 123-2 at 81:9-82:18]

Second, Collazo's contention that the evidence established that Progressive overlooked and disregarded Collazo's herniations and permanent injury claims [DE 101 at 10-12] ignores the fact that Progressive valued and offered sums that contemplated Collazo's potential general damages that would have been due or payable only upon a showing or finding of permanency [DE 123-1 at 181:24-182:4] Similarly, Collazo's characterization that the evidence indicated that Progressive refused to allocate or value future medical damages [DE 101 at 10-12] ignores the fact that, at the time of the CRN, there was no extant recommendation for future medical procedures or any other treatment. Indeed, Collazo's contention that the evidence was that Progressive knew that Collazo's injuries would continue to worsen over time and that surgery was required [DE 101 at 10-12] is contrary to the record evidence regarding Collazo's condition and treatment **during the CRN period**. [DE 123-1 at 19:4-12; 121:6-11; 122:23-123:18]

Third, Collazo's position that Progressive cannot argue that it was prejudiced by the admission of post-CRN conduct because it introduced and relied upon such evidence at trial [DE 101 at 10-12] overlooks the fact that Progressive introduced evidence of post-CRN conduct **because the district court's rulings on the Motion *in Limine* necessitated it**. Specifically, the district court granted Progressive, at the outset of trial, a standing objection to the introduction of post-CRN evidence. [DE 123-1 at 4:17-5:2] Accordingly, Collazo's claim that Progressive cannot assert

prejudice because Progressive offered post-CRN evidence or relied upon such evidence at trial is unfounded. The district court's decision to allow Collazo to introduce post-CRN evidence required Progressive to attempt to explain to the jury why the evidence regarding Collazo's medical condition and treatment extant while the CRN was pending was different from that which was presented months **after** the expiration of the CRN cure period and **after** Collazo was unwilling to accept the UM limits.

The improper juxtaposition of Progressive's settlement and valuation decisions **during** the CRN period with the worsening of Collazo's condition and additional surgical procedures and surgical recommendations (and the ultimate verdict and underlying judgment) **after** the CRN substantially and unfairly prejudiced Progressive's defense and improperly tainted the jury such that it could not make a fair determination of Progressive's action during—and only during—the relevant time: while the CRN was pending.[3]

---

[3] The district court's failure to give the instructions also resulted in prejudicial harm to Progressive. As explained above, the jury needed to know how Florida law treats claims for non-economic and economic damages so the jury could fully and fairly assess whether Progressive's valuation of Collazo's UM claim through the expiration of the CRN was in bad faith. Instead, without those critical instructions, and with Collazo's emphasis on comparing the amount of the tort judgment to the amount of damages that Progressive had valued during the claim process, the jury was essentially left with the understanding that Progressive acted in bad faith simply because Progressive's valuation did not match up with what the tort jury awarded years later based upon different evidence. That is not how a claim for bad faith is evaluated under Florida law, and Progressive requested the proposed instructions to

As explained above, *supra* at p. 11, because this issue is strictly one of Florida law, there is no Florida appellate decision directly on point, and it is a far too common abuse of the system in insurance bad faith cases, Progressive respectfully requests that the Court certify a question to the Florida Supreme Court on this issue. Progressive suggests the following question for certification[4]:

Is evidence of events that occur post expiration of a Civil Remedy Notice, including a verdict, admissible in insurance bad faith actions concerning an uninsured/underinsured motorist insurer's alleged failure to settle under section 624.155(1)(b)1., Florida Statutes?

## CONCLUSION

WHEREFORE, for the foregoing reasons, Progressive respectfully requests that the Court reverse the Bad Faith Judgment in favor of Collazo and against Progressive, and remand for a new trial at which Collazo cannot introduce evidence

---

avoid such a result. The prejudice to Progressive was further compounded because, without the jury instructions it requested, the jury was not provided the context and parameters under which the UM Lawsuit jury reached its damages determinations.

[4] The Court may certify a question to the Florida Supreme Court "[w]hen faced with substantial doubt on a dispositive state law issue." *See NBIS Construction & Transport Ins. Servs., Inc. v. Liebherr-America, Inc.*, 93 F.4th 1304, 1314-15 (11th Cir. 2024); *see also Tobin v. Michigan Mut. Ins. Co.*, 398 F.3d 1267, 1274-75 (11th Cir. 2005) ("Where there is doubt in the interpretation of state law, a federal court may certify the question to the state supreme court to avoid making unnecessary *Erie* guesses and to offer the state court the opportunity to interpret or change existing law.").

of the amount of the underlying verdict and judgment in the UM Lawsuit, or evidence of post-CRN events.

Progressive also requests that the Court certify the following question of Florida law to the Florida Supreme Court:

Is evidence of events that occur post expiration of a Civil Remedy Notice, including a verdict, admissible in insurance bad faith actions concerning an uninsured/underinsured motorist insurer's alleged failure to settle under section 624.155(1)(b)1., Florida Statutes?

Respectfully submitted,

/s/ Kristen M. Fiore
KRISTEN M. FIORE, BCS (25766)
**AKERMAN LLP**
201 E. Park Avenue, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 224-9634
Facsimile: (850) 222-0103
kristen.fiore@akerman.com

ANTONIO D. MORIN (187860)
GARY J. GUZZI (159440)
**AKERMAN LLP**
98 SE 7th Street, Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600
Telecopier: (305) 374-5095
antonio.morin@akerman.com
gary.guzzi@akerman.com

Counsel for Appellant

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 28.1(e)(2). This brief contains 8,131 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Kristen M. Fiore
KRISTEN M. FIORE, BCS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 2, 2025, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties in this case whom are registered through the CM/ECF.

/s/ Kristen M. Fiore
KRISTEN M. FIORE, BCS