IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 25-11524-D

---

KEVIN COLLAZO,

*Plaintiff-Appellee*,

v.

PROGRESSIVE SELECT INSURANCE COMPANY,

*Defendant-Appellant*.

---

# BRIEF OF PLAINTIFF-APPELLEE

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

Elliot B. Kula
William D. Mueller
KULA & ASSOCIATES, P.A.
12000 Biscayne Blvd., Ste. 221
Miami, Florida 33181
Telephone: (305) 354-3858
Facsimile: (305) 354-3822
eservice@kulalegal.com
elliot@kulalegal.com
william@kulalegal.com

Stephen A. Marino, Jr.
Rochelle N. Wimbush
VER PLOEG & MARINO, P.A.
100 S.E. Second St., Ste. 3300
Miami, Florida 33131
Telephone: (305) 577-3996
Facsimile (305) 577-3558
smarino@vpm-legal.com
rwimbush@vpm-legal.com

*Co-Counsel for Plaintiff-Appellee*

<u>COLLAZO V. PROGRESSIVE SELECT INS. CO.</u>

**<u>Case No. 25-11524-D</u>**

## CERTIFICATE OF INTERESTED PERSONS AND <u>CORPORATE DISCLOSURE STATEMENT</u>

Plaintiff-Appellee, Kevin Collazo, submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this review:

1. Akerman LLP, *Attorneys for Defendant-Appellant*
2. Collazo, Kevin, *Plaintiff-Appellee*
3. Fiore, Kirsten M., Esq., *Attorney for Defendant-Appellant*
4. Garcia, Jorge J., Esq., *Attorney for Plaintiff-Appellee*
5. Guzzi, Gary John, Esq., *Attorney for Defendant-Appellant*
6. Kula & Associates, P.A., *Attorneys for Plaintiff-Appellee*
7. Kula, Elliot B., Esq., *Attorney for Plaintiff-Appellee*
8. Luis, Hon. Lauren Fleischer, *U.S. Magistrate Judge*
9. Marino, Stephen A., Jr., Esq., *Attorney for Plaintiff-Appellee*
10. Moore, Hon. K. Michael, *U.S. District Court Judge*
11. Morgan & Morgan, P.A., *Attorney for Plaintiff-Appellee*
12. Morin, Antonio DeJesus, *Attorney for Defendant-Appellant*
13. Mueller, William D., Esq., *Attorney for Plaintiff-Appellee*
14. Progressive Select Ins. Co., *Defendant-Appellant*

**CERTIFICATE OF INTERESTED PERSONS**
**AND**
**CORPORATE DISCLOSURE STATEMENT**
(Continued)

15. Wimbush, Rochelle N., Esq., *Attorney for Plaintiff-Appellee*
16. Ver Ploeg & Marino, P.A., *Attorneys for Plaintiff-Appellee*

Pursuant to Federal Rule of Appellate Procedures 26.1 and Eleventh Circuit Rules 26.101 through 26.1-3, Plaintiff-Appellee, Kevin Collazo, makes the following statement as to corporate ownership:

Kevin Collazo is an individual

Progressive Select Insurance Company is an indirect, wholly-owned subsidiary of The Progressive Corporation, which is publicly traded on the NYSE under the symbol PGR. No other publicly held corporation owns ten percent (10%) or more of Progressive's stock

/s/ **Elliot B. Kula**
Elliot B. Kula

## STATEMENT REGARDING ORAL ARGUMENT

The facts are well established by the Record on Appeal and the governing law is fully settled, with a deferential standard of review to be applied. Oral argument would not be a beneficial expenditure of judicial or litigant resources.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .......... C-1

STATEMENT REGARDING ORAL ARGUMENT .......... i

TABLE OF CONTENTS .......... ii

TABLE OF CITATIONS .......... iv

STATEMENT OF JURISDICTION .......... 1

STATEMENT OF THE CASE .......... 1

I. COURSE OF PROCEEDINGS. .......... 1

II. STATEMENT OF THE FACTS. .......... 2

A. The Pleadings. .......... 2

B. Pre-Trial *In Limine* Ruling. .......... 3

C. Jury Trial. .......... 5

III. STATEMENT OF THE STANDARD OF REVIEW .......... 13

SUMMARY OF ARGUMENT .......... 15

ARGUMENT .......... 17

I. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION BY ALLOWING THE JURY TO CONSIDER THE TOTALITY OF THE CIRCUMSTANCES COMPLIANT WITH FLORIDA BAD FAITH LAW. .......... 17

A. Florida's Totality of the Circumstances Standard. .......... 17

B. The Purpose Behind the Civil Remedy Notice

**TABLE OF CONTENTS**
(Continued)

**Page**

Requirement. ....................................................................21

C. The District Court Exercised its Discretion Consistent with Florida Bad Faith Law. ..................................23

CONCLUSION ................................................................................45

CERTIFICATE OF COMPLIANCE .....................................................46

CERTIFICATE OF SERVICE ............................................................46

## TABLE OF CITATIONS

**Page**

***Cases***

*Allstate Indem. Co. v. Ruiz*,
899 So. 2d 1121 (Fla. 2005) ........ 27, 28

*Bell v. Geico Gen. Ins. Co.*,
489 Fed. Appx. 428 (11th Cir. 2012) ........ 26

**Berges v. Infinity Ins. Co.*,
896 So. 2d 665 (Fla. 2004) ........ passim

*Fid. & Cas. Co. of New York v. Cope*,
462 So. 2d 459 (Fla. 1985) ........ 20, 38

*FoxHaven of Foxfire Condo. IV Ass'n, Inc. v. Nationwide Mut. Fire Ins. Co.*,
2:13-CV-399-FTM-29CM, 2015 WL 667935 (M.D. Fla. Feb. 17, 2015) ........ 26

*Fridman v. Safeco Ins. Co. of Illinois*,
185 So. 3d 1214 (Fla. 2016) ........ 19, 39

*Frisco v. State Farm Florida Ins. Co.*,
2D2024-0464, 2025 WL 3466524 (Fla. 2d DCA Dec. 3, 2025) ........ 22, 23

*Galante v. USAA Cas. Ins. Co.*,
895 So. 2d 1189 (Fla. 4th DCA 2005) ........ 24

**GEICO Gen. Ins. Co. v. Paton*,
150 So. 3d 804 (Fla. 4th DCA 2014) ........ passim

*Hancock v. Florida Farm Bureau Gen. Ins. Co.*,
421 So. 3d 459 (Fla. 2d DCA 2025) ........ 39

**Harvey v. GEICO Gen. Ins. Co.*,
259 So. 3d 1 (Fla. 2018) ........ 38, 39, 41

*Julien v. United Prop. & Cas. Ins. Co.*,
311 So. 3d 875 (Fla. 4th DCA 2021) ........ 24

## TABLE OF CITATIONS
(Continued)

**Page**


**Kafie v. Nw. Mut. Life Ins. Co.*,
11-21251-CIV, 2011 WL 4499051 (S.D. Fla. Sept. 27, 2011) ............. 25, 27, 35

*Kilpatrick v. Breg, Inc.*,
613 F.3d 1329 (11th Cir. 2010) ....................................................................13

*King v. Gov't Employees Ins. Co.*,
8:10-CV-977-T-30AEP, 2012 WL 4052271 (M.D. Fla. Sept. 13, 2012)..... 20, 23

*Landers v. State Farm Florida Ins. Co.*,
234 So. 3d 856 (Fla. 5th DCA 2018)...............................................................21

*Lugassy v. United Prop. & Cas. Ins. Co.*,
351 So. 3d 23 (Fla. 4th DCA 2022)..................................................................23

*McGinnis v. Am. Home Mortgage Servicing, Inc.*,
901 F.3d 1282 (11th Cir. 2018) ......................................................................14

*Neal v. GEICO Gen. Ins. Co.*,
358 So. 3d 749 (Fla. 4th DCA 2023)...............................................................21

*Powell v. Prudential Prop. & Cas. Ins. Co.*,
584 So. 2d 12 (Fla. 3d DCA 1991)..................................................................20

*Proctor v. Fluor Enterprises, Inc.*,
494 F.3d 1337 (11th Cir. 2007) ................................................................. 42, 44

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
326 F.3d 1333 (11th Cir. 2003) ......................................................................14

*Talat Enterprises, Inc. v. Aetna Cas. & Sur. Co.*,
753 So. 2d 1278 (Fla. 2000)...........................................................................22

*United States v. Harrison*,
534 F.3d 1371 (11th Cir. 2008) ......................................................................13

*United States v. Maunteca-Lopez*,
519 Fed. Appx. 608 (11th Cir. 2013)...............................................................13

## TABLE OF CITATIONS
(Continued)

**Page**

*United States v. Williams*,
785 Fed. Appx. 692 (11th Cir. 2019) .......... 13

*Vest v. Travelers Ins. Co.*,
753 So. 2d 1270 (Fla. 2000) .......... 21, 23

*Woods v. Progressive Am. Ins. Co.*,
159 F.4th 837 (11th Cir. 2025) .......... 40, 41

*Zaleski v. State Farm Fla. Ins. Co.*,
315 So. 3d 7 (Fla. 4th DCA 2021) .......... 22

***Statutes***

28 U.S.C. § 1291 (2023) .......... 1

28 U.S.C. § 1332 (2023) .......... 1

§ 624.155, Fla. Stat. (2023) .......... passim

§ 627.727, Fla. Stat. (2023) .......... 20

***Rules***

Fed. R. Civ. P. 61 .......... 42

## STATEMENT OF JURISDICTION

The district court properly exercised subject-matter jurisdiction over this case under 28 U.S.C. § 1332 (2023), because the parties are diverse and the amount in controversy exceeds the jurisdictional threshold. DE:1.

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291 (2023), because this appeal arises from a final judgment of the district court.

## STATEMENT OF THE CASE

### I. COURSE OF PROCEEDINGS.

Kevin Collazo filed a bad faith action against Progressive Select Insurance Company ("Progressive") on March 22, 2023 in Miami-Dade County Circuit Court, alleging that Progressive breached its fiduciary duties to Collazo by failing to settle his claim within the policy limits when it could and should have done so. DE:1. Progressive removed the case to the Southern District of Florida based on diversity of citizenship and an amount in controversy exceeding the sum of $75,000.00. DE:1.

The case proceeded to a jury trial (DE:123), after litigation discussed more fully in the Statement of the Facts, resulting in a jury verdict in Collazo's favor, awarding him $844,220.18. DE:88.

The district court, upon the denial of Progressive's post-trial motion, entered Final Judgment, then an Amended Final Judgment, in Collazo's favor. DE:91, DE:108.

This appeal by Progressive followed. DE:121.

## II. STATEMENT OF THE FACTS.

### A. The Pleadings.

Following the exhaustion of his uninsured/underinsured motorist ("UM") benefits through the underlying state court proceedings, and after Progressive's rejection of his Civil Remedy Notice ("CRN") demand, Collazo initiated this statutory bad faith action against Progressive in Miami-Dade County Circuit Court in October 2020. DE:1-5 at 7-15. The Complaint alleged two counts: (1) a claim for UM benefits under the insurance policy and applicable Florida law; and (2) a claim for unfair and deceptive claims practices and statutory bad faith under section 624.155, Florida Statutes. *Id.* The statutory bad faith count was predicated on Progressive's failure to settle Collazo's UM claim for the policy limits even though the true value of his claim—as ultimately determined by a jury in the underlying UM litigation—substantially exceeded Progressive's $44,200 evaluation and offer.

Progressive removed the action to this Court on August 7, 2023, invoking diversity jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. DE:1.

On August 14, 2023, Progressive filed its Answer and Affirmative Defenses to the Complaint. DE:3. Progressive's Answer denied or qualified the material allegations of Collazo's Complaint relating to bad faith, contending essentially that: (1) its $44,200 offer was reasonable based on the medical information available during the CRN cure period; (2) Collazo would be unable to demonstrate that Progressive acted in bad faith in evaluating or settling his claim; and

(3) various affirmative defenses, including lack of causation and intervening or superseding causes. *Id*.

But Progressive's Answer failed to articulate what would later become its central defense at trial: that evidence of post-CRN medical developments and the underlying UM jury verdict should be excluded from the bad faith analysis.[1]

### B. Pre-Trial *In Limine* Ruling.

The most consequential pretrial proceedings involved disputes over admissibility of evidence relating to post-CRN developments and the amount of the underlying UM jury verdict.

Progressive filed an Omnibus Motion in Limine seeking to exclude evidence of post-CRN events, including Collazo's cervical spine surgery, the recommendation for lumbar surgery, and the amount of the underlying jury verdict in the UM litigation. DE:44. Progressive contended that such evidence was irrelevant to whether it acted in bad faith during the cure period provided by Florida's CRN statute (between August and October 2020). *Id*.

Collazo opposed the motion, arguing that post-CRN evidence, including the underlying UM verdict, was highly relevant to establishing whether Progressive acted in bad faith for the following reasons:

> (1) the true value of his claim was ultimately determined by the jury verdict;

[1] Notably, at the time of its Answer, Progressive had access to discovery materials and medical records establishing that Collazo had undergone significant additional medical treatment—including cervical spine surgery—after the CRN period expired and after it had rejected the $100,000 demand.

> (2) Florida's "totality of the circumstances" standard for evaluating bad faith requires consideration of all facts bearing on the reasonableness of an insurer's conduct and evaluation;
>
> (3) Progressive's June 2021 offer of the full policy limits—made immediately upon learning of Collazo's post-CRN medical developments—demonstrated that those developments, had they been known earlier, would have triggered an obligation to settle; and
>
> (4) Progressive's arbitrary adherence to a "frozen in time" approach to the CRN period, while forcing Collazo to defend a verdict based on far more complete medical information, created an unfair and asymmetrical comparison incompatible with the bad faith standard.

DE:52.

Collazo further argued that the underlying UM verdict was probative of damages causation and the permanency of his injuries, both of which bore on Progressive's duty to thoroughly investigate and fairly evaluate his claim. *Id.*

The district court disposed of Progressive's Motion in Limine in an omnibus order and denied Progressive's request to exclude post-CRN evidence and the amount of the underlying UM verdict. DE:72 at 6. In doing so, the district court found that the post-CRN evidence was admissible under Florida's "totality of the circumstances" standard for evaluating bad faith under section 624.155. *Id.* The district court reasoned that all facts and circumstances, "includ[ing] the time up to and including the date of resolution of the underlying matter," could be relevant to whether an insurer acted in bad faith in its handling of a claim. DE:72 at 6.

The district court further found that any Rule 403 prejudice analysis did not require exclusion of the evidence, as the probative value of post-CRN medical developments—demonstrating the progressive nature of Collazo's injuries and the

ultimate extent of his damages—was not substantially outweighed by any risk of prejudice. *Id.*

The district court's ruling recognized that Progressive's defense would not be impaired by admission of this evidence, as Progressive remained free to argue that its evaluations and offers were reasonable based on the information available during the CRN period, and that Collazo's subsequent medical deterioration was not foreseeable or was the product of independent intervening causes. *Id.*

### C. Jury Trial.

#### (1) The Standing Objection.

As trial commenced, Progressive sought to preserve its evidentiary objections through a standing objection to post-CRN evidence. The trial court addressed this matter on the record:

> THE COURT: Okay, are we ready?
>
> MS. WIMBUSH: Yes. Plaintiff is ready, your Honor.
>
> THE COURT: Okay. Have a seat. Let's wait until they bring the jury up.
>
> MR. MORIN: Excuse me, your Honor. We wanted to address one issue regarding a prior ruling on a motion in limine to make sure that ruling is consistent so we can address it and have a standing objection to it.
>
> THE COURT: What is that?
>
> MR. MORIN: There's an issue regarding evidence of the post CRN period. The Court denied it. We understand that's the ruling, and so we just wanted to have a standing objection to that issue, as opposed to having to raise it every time.

> THE COURT: Okay. We will have the objection, the standing objection, and will deny it.

DE:123-1.

By granting this standing objection and then denying it, the trial court made clear that the admission of post-CRN evidence would proceed. The district court also denied Progressive's request for special jury instructions that would have limited the jury's consideration to the CRN period exclusively. DE:123-2 at 7.

**(2) Testimony Regarding the Accident.**

The trial evidence established that on June 27, 2019, Collazo was driving his vehicle near Miami-Dade County, Florida, when a vehicle driven by Faris Hillaire struck the rear of his vehicle. DE:123-1 at 82. Collazo testified about the impact:

> I was leaving my place of employment here at Mount Sinai Medical Center in Miami Beach. I had just taken Alton Road and then turned onto I-195 going towards 75, and I got rear-ended when the traffic was coming to a stop…. I got shaken inside my car. I remember hitting with my knee and the leg the center console, and, of course, the driver's seatbelt pulling me back towards my seat, and my hip shaking in the car.

DE:123-1 at 69.

***What Progressive Knew About the Accident*:**

At the time of the accident, Hillaire's vehicle was disabled (airbags deployed, fluids leaked), and police were called, and they found the other driver at fault and cited him. DE:123-1 at 70. Progressive was notified of the accident by Collazo that same evening. DE:123-1 at 71. The damage to both vehicles demonstrated a significant impact requiring police involvement and towing.

### (3) Collazo's Immediate Condition and Initial Treatment (June 2019 - May 2020)

Following the accident, Collazo initially experienced soreness but returned to work the next day. DE:123-1 at 71. By the second day, however, he developed a headache that interfered with his ability to concentrate, accompanied by neck pain and emerging lower back discomfort. DE:123-1 at 72. These symptoms began to interfere with his daily activities. DE:123-1 at 72.

Over the following months, Collazo pursued treatment, beginning with chiropractic care and then escalating to more aggressive interventions including nerve blocks and ablation procedures. DE:123-1 at 85. The trial evidence established that Collazo:

- Underwent chiropractic treatment. DE:123-1 at 73.
- Underwent two nerve block procedures. DE:123-1 at 85.
- Underwent ablation procedures in May 2020. DE:123-1 at 85.

***What Progressive Knew About Initial Treatment*:**

Progressive received and reviewed medical records documenting these treatment efforts during 2019 and early 2020. DE:123-1 at 155, 212–215, 123-2 at 73, 79, 99. Progressive's corporate representative acknowledged that "at the time that Progressive is adjusting and evaluating this, they have records and narratives from the doctors who are treating Mr. Collazo…." DE:123-1 at 154. Attorney Garcia testified that he "enclosed all the medical records" and forwarded "[e]verything in [his] possession" to Progressive. DE:123-1 at 212. Progressive's claims adjuster, Constance Hampton, confirmed that she conducted a "review of

what the injuries were and what treatment was received" and that "[m]edical records were also reviewed." DE:123-2 at 71–73. Hampton's notes documenting "treatment received" were based on her "review of the medical records that are received at the time," which included the chiropractic treatment and the radiofrequency ablation. DE:123-2 at 79, 99.

**(4) The Filing of Collazo's CRN.**

On August 26, 2020, Collazo filed a Civil Remedy Notice with the Florida Department of Financial Services, demanding that Progressive pay the full $100,000 UM policy limits. DE:92-13. The CRN was a "two-and-a-half page notice explaining what the insured was complaining about," which stated that Collazo's "permanent injuries resulted in him incurring medical expenses in the past and will certainly incur more in the future for continued management." DE:123-1 at 171–172. The CRN listed out the following ailments and medical costs incurred and alleged that Progressive was acting in bad faith by failing to tender the UM policy limits despite notice that Collazo had sustained permanent cervical and lumbar injuries, had already incurred significant medical expenses, and would "certainly incur more in the future for continued management" of those injuries:

- Cervical and lumbar spine injuries caused by the June 27, 2019 accident.
- Ongoing pain and treatment, with medical expenses already incurred and additional expenses anticipated in the future.
- Allegations that the injuries were permanent in nature.

- An assertion that Progressive acted in bad faith by failing to tender the $100,000 UM policy limits despite notice of those injuries and damages

DE:92-13 at 2–3.

During the 60-day safe harbor period (August 26th through October 26th), Progressive evaluated Collazo's claim based on the medical records then available and made a settlement offer of $44,200. DE:92-10. Here's what the evidence at trial demonstrated that Progressive knew during this period.

***Progressive Knew About Collazo's Injuries Detailed in CRN*:**

During the CRN safe harbor period, Progressive's claim file contained:

- September 2019 MRI findings documenting disc herniations at two different levels—cervical and lumbar. DE:123-2 at 131-32. Progressive "ha[d] got documented, from September, of the prior year, disk herniation at two different parts of his body." *Id.*
- Dr. Narson's permanency opinion, stating to a reasonable degree of chiropractic certainty that Collazo had sustained a permanent injury. DE:123-1 at 218–220; DE:123-2 at 46. Progressive's own adjuster, Baker, acknowledged: "The threshold was met with the chiropractic bill. The chiropractor had documented that he had, in his opinion, sustained permanent injury. So, I allowed for the threshold being met." DE:123-2 at 45–46.
- A future medical care evaluation form prepared by Dr. Narson opining that "the injury is permanent, not going to get better without future care." DE:123-1 at 219.

- Medical records documenting that Collazo's "symptoms would worsen and have further disabling effects" on his ability to perform daily activities, and that his impairment was "permanent in nature." DE:123-1 at 129–131.

And the demand letters sent to Progressive expressly warned that Collazo's doctors "anticipated that [the] condition would worsen and degenerate over time." DE:123-1 at 132. Indeed, Attorney Garcia testified that he advised Progressive "the treatment was getting increasingly more aggressive. [Collazo's] symptoms continued to get worse." DE:123-1 at 218. Progressive was told that "over the course of time, his injuries and symptoms were worsening." DE:123-1 at 213–214.

Progressive's Level 48 adjuster—its most experienced level—reviewed the file and concluded "out of the box … He has a permanent injury." DE:123-2 at 131–32. Progressive's corporate representative admitted "the chiropractor said something about it, right. So, it was in there, if the chiropractor said something about it." DE:123-1 at 167.

Most significantly, Progressive's own internal evaluation valued the claim at policy limits. As the corporate representative confirmed, when the suit was filed, Baker "looks at the file" and set "the reserves, the money we are setting aside that we may have to pay, that is $100,000—policy limits." DE:123-2 at 130–131; DE:123-2 at 63; DE:123-1 at 206. That is, Progressive internally valued this claim at $100,000 while offering only $44,200. DE:123-1 at 206.

Progressive chose not to obtain any contrary medical opinion regarding Collazo's herniations. As the corporate representative admitted: "Progressive has no medical or professional opinion that counteracts the treating physician's

information being given." DE:123-1 at 157–158. There was "no IME as to his herniations in his neck, his herniations in lumbar." DE:123-1 at 159. The only IME was a September 2019 PIP examination that "dealt solely with the chiro[practic] bills." DE:123-1 at 159.[2]

Despite all of this, Progressive offered only $44,200 during the CRN period. DE:123-1 at 169. The question the jury had to answer was not whether Progressive could have known Collazo's claim was worth policy limits—its own reserves show it did know. DE:123-2 at 130–131; DE:123-2 at 63; DE:123-1 at 206. The question the jury had to wrestle with was why Progressive chose to offer less than half of what its own file reflected the claim was worth, to its own insured, while possessing uncontradicted medical evidence of permanent spinal injuries and warnings that those injuries would worsen over time.

**(5) The Post-CRN Evidence.**

In 2021, Collazo's pain increased and he contacted Dr. Popinchalk's office to schedule an appointment. DE:123-1 at 122. Dr. Popinchalk ordered additional MRIs and then recommended two surgeries—one for Collazo's cervical spine and

[2] Progressive insists that Collazo reported a pain level of 1 out of 10 on July 29, 2020. Appellant's Brief at 16, 28. But this temporary improvement—following the May 2020 ablation procedures—did not negate what Progressive already knew: Collazo had documented disc herniations, a permanency opinion, and doctors warning his condition would worsen. Indeed, Collazo testified that his pain "never really went away" and that the ablation provided relief only "for a few months" before his pain returned. DE:123-1 at 84–86. The trial evidence corroborated that logical conclusion borne out by the medical records: the structural damage Progressive knew about did not disappear because Collazo had one good day.

one for his lumbar spine. DE:123-1 at 122–124. Collazo testified that surgery had been "discussed earlier in the treatment" as a possibility, but that he and his doctors "had decided against it until that appointment" when conservative treatment options had been exhausted. DE:123-1 at 123.

Collazo's cervical surgery was scheduled for April 2021. DE:123-1 at 124. As Collazo had earlier testified, surgery would follow after conservative treatments failed: "We have exhausted all the conservative care, chiropractor first, then the nerve blocks, the ablation, and now we are going to surgery." DE:123-1 at 85.

After learning of Collazo's cervical surgery, Progressive offered the $100,000 policy limits in June 2021. DE:123-1 at 122–124, 201–202. Progressive's corporate representative confirmed that the surgery was the reason for the changed valuation: "[w]e were notified that he had had—it is a surgical procedure done to his cervical spine." DE:123-1 at 201. At that point, Collazo rejected the offer because his medical bills already exceeded $100,000. DE:123-1 at 124. At the time of the underlying UM trial in July 2022, Collazo had also received a recommendation for lumbar surgery, though it had not yet been performed. DE:123-1 at 202–03.

The jury in the UM lawsuit returned a verdict of $844,220.18—more than eight times the $100,000 policy limits. DE:123-1 at 87. The jury found that Collazo had sustained a permanent injury caused by the June 2019 accident. DE:123-1 at 87. The damages awarded included $252,000 in past medical expenses, $150,500 in future medical expenses, and approximately $441,000 in

past and future pain and suffering. DE:123-1 at 87. The UM verdict was introduced as evidence at trial. DE:123-1 at 172.

#### (6) The Verdict and Final Judgment.

The jury returned a verdict in favor of Collazo, finding that he had proven "by a preponderance of the evidence that [Progressive] acted in bad faith by failing to settle his underinsured motorist claim when it could have and should have done so." DE:88. Following the denial of Progressive's post-trial motion, the district court entered Final Judgment, then an Amended Final Judgment, in favor of Collazo. DE:91, DE:108.

## III. STATEMENT OF THE STANDARD OF REVIEW.

The parties agree that the Court reviews a district court's rulings on motions in limine, or "evidentiary decisions" in general, under the "deferential standard of review," abuse of discretion. *United States v. Maunteca-Lopez*, 519 Fed. Appx. 608, 609 (11th Cir. 2013); *United States v. Harrison*, 534 F.3d 1371, 1373 (11th Cir. 2008); *United States v. Williams*, 785 Fed. Appx. 692, 696 (11th Cir. 2019). "This standard of review requires that we defer to the district court's ruling unless it is manifestly erroneous." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1334 (11th Cir. 2010) (internal citations omitted). That is, "it is very much a matter of discretion with the court whether to receive or exclude the evidence; but the appellate court will not reverse in such a case, unless the ruling is manifestly erroneous." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003) (internal citations omitted).

The same standard applies to the district court's denial of a new trial. *See McGinnis v. Am. Home Mortgage Servicing, Inc.*, 901 F.3d 1282, 1291 (11th Cir. 2018).

Progressive suggests that where a district court's ruling is based on a legal conclusion, or error of law, the standard changes to a de novo standard. Principal Brief of Appellant Progressive Select Insurance Company ("Appellant's Brief") at 8–9. But Progressive has failed to identify the legal conclusion subject to such a standard. Rather, the district court's ruling is reflective of discretionary decision made following a reasonable view of the trial evidence.

## SUMMARY OF ARGUMENT

Progressive's appeal rests on a fundamental mischaracterization of Florida bad faith law. Progressive's argument assumes that the filing and expiration of a Civil Remedy Notice freezes the evidentiary record and cabins the jury's inquiry to a narrow snapshot in time. Florida law does not impose that limitation. Instead, a bad faith claim turns on whether the insurer acted fairly and honestly toward its insured, with due regard for the insured's interests, under the totality of the circumstances: from the time the claim is filed to the time the claim is resolved. The district court applied that settled standard and correctly allowed the jury to evaluate Progressive's conduct in context.

The CRN affords the insurer an opportunity to cure; it does not redefine the standard of conduct, limit the jury's evidentiary lens, or freeze the factual record in time. Progressive's proposed cutoff would transform the CRN from a notice mechanism into an evidentiary shield, insulating unreasonable claims handling that occur after the CRN's safe-harbor period from meaningful review whenever injuries evolve after the cure period. Florida law rejects that result.

The district court therefore acted well within its discretion in admitting post-CRN evidence, including the underlying verdict, to permit the jury to assess Progressive's conduct in context. That evidence did not impose hindsight liability or strict liability; instead, it illuminated whether Progressive's evaluation and settlement posture reasonably accounted for the risks it faced based on what was known—and what was foreseeable—when it chose not to settle.

Progressive was free to argue that its decisions were reasonable at the time they were made and that Collazo's later surgeries were completely unforeseeable based on the evidence it was provided. It did that, but the jury simply disagreed. Because the district court applied the correct legal standard, admitted relevant evidence consistent with that standard, and properly denied Progressive's motion for a new trial, the final judgment should be affirmed.

## ARGUMENT

### I. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION BY ALLOWING THE JURY TO CONSIDER THE TOTALITY OF THE CIRCUMSTANCES COMPLIANT WITH FLORIDA BAD FAITH LAW.

#### A. Florida's Totality of the Circumstances Standard.

There is a disconnect between Progressive's view of the significance of a Civil Remedy Notice ("CRN") in a Florida bad faith action and the governing legal standard for proving bad faith. Florida law does not impose a rigid "cut-off" that restricts a factfinder's view of the insurer's conduct to the mere filing of a CRN and the ensuing safe harbor period. Instead, Florida law evaluates an insurer's performance under an objective totality-of-the-circumstances test that asks whether the insurer acted fairly, honestly, and with due regard for its insured from the moment the claim was filed to the date the injury—in most cases an excess verdict—was suffered. Understanding that standard is the first step to recognizing the flaw in Progressive's position: the CRN is a procedural prerequisite to get into court, not a temporal barrier that resets or narrows the substantive inquiry into the insurer's good-faith obligations.

Florida's bad faith standard is guided by the relevant language in sections 624.155 and 626.9541, Florida Statutes, that allows for the bringing of a bad faith claim against an insurer when the insurer commissions one of the delineated acts. The operative bad faith conduct in this case is found in section 624.155(1)(b)(1):

> 1. Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly

> and honestly toward its insured and with due regard for her or his interests.

§ 624.155(1)(b)(1), Fla. Stat. (2023). That language is replicated in Florida's Bad Faith Jury Instruction, 404.4, which articulates a "prudent person" standard that must be applied in all cases where the bad faith allegation revolves around the insurer's failure to settle the insured's claim:

> Bad faith on the part of an insurance company is failing to settle a claim when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward [its policyholder] [its insured] [an excess carrier] and with due regard for [his] [her] [its] [their] interests.

Fla. Stnd. Jury Instr. 404.4. *See also* DE:80 at 25. This instruction requires that the jury consider whether the insurer acted in bad faith "under **all** the circumstances" when it failed to settle a claim. *Id*. (emphasis added). It follows from the plain text above, that the scope of the inquiry encompasses the circumstances from the inception of the claim through the point at which settlement efforts fail.

That is consistent with Florida law, which articulates an objective totality of the circumstances test: In Florida, "the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004) (citations omitted). That standard requires an assessment of the "totality" of each case's "facts" and an application of the objective assessment of whether the insurer acted "in good faith with due regard for the interests of the insured." *Id*.

The Florida Supreme Court articulated the objective totality of the circumstances standard as so:

> Indeed, in *Boston Old Colony*, we stated in no uncertain terms that an insurer has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. We explained that this duty obligated an insurer to exercise such control over the handling of the claim and make such decisions in good faith and with due regard for the interests of the insured. Additionally, not only is an insurer required to refrain from acting in its own interests in handling the claim, but it must also act with care and diligence. Thus, the Eleventh Circuit's contention that an insurer need not act prudently or even reasonably also misconstrues our well-established bad faith precedent.

*Id*. (internal quotations omitted).

Included in the flexible totality of the circumstances test is consideration of an insurer's fiduciary duty to act in good faith to protect its insured from excess judgments. Under Florida law, "if the injured third party or the insured is successful in establishing that the insurer breached the duty of good faith in handling the claim, the plaintiff is entitled to recover the full extent of the damages to which the insured was exposed, including an excess judgment." *Fridman v. Safeco Ins. Co. of Illinois*, 185 So. 3d 1214, 1220 (Fla. 2016) (citations omitted). That is, by all accounts, the very essence of a bad faith suit:

> The essence of a "bad faith" insurance suit (whether it is brought by the insured or by the injured party standing in his place), is that the insurer breached its duty to its insured by failing to properly or promptly defend the claim (which may encompass its failure to make a good faith offer of settlement within the policy limits) — all of which results in the insured being exposed to an excess judgment.

*Fid. & Cas. Co. of New York v. Cope*, 462 So. 2d 459, 460 (Fla. 1985) (internal citations omitted). Which is to say, in a bad faith suit, the insurer's actions are assessed to determine whether they "act[ed] in bad faith in failing to complete the settlement within the time deadlines, thereby insulating its insured from an excess judgment." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 679 (Fla. 2004).[3]

The insurer's duty to prevent the imposition of an excess judgment arises from the insurer's control over the defense and settlement of claims, which places the insured's financial interests in the insurer's hands. *Cope*, 462 So. 2d at 460. For that reason, a breach of this duty can render the insurer liable for damages exceeding the policy limits, including an excess judgment. *See* § 627.727(9), Fla. Stat. (2023) (stating that the damages an insured can recover in a bad faith action "shall include the total amount of the claimant's damages, including the amount in excess of the policy limits, any interest on unpaid benefits, reasonable attorney's fees and costs, and any damages caused by a violation of a law of this state").

The point of inquiry, therefore, necessarily begins when the claim is presented to the insurer and extends through the point at which the insurer's conduct results in compensable harm to the insured, including exposure to an excess judgment.

---

[3] Conversely, "an insurer's ultimate tender of the policy limits does not necessarily insulate it from liability by an insured's claim of bad faith" when the insured was exposed to an excess judgment despite the tender of limits. *King v. Gov't Employees Ins. Co.*, 8:10-CV-977-T-30AEP, 2012 WL 4052271, at *3 (M.D. Fla. Sept. 13, 2012) (citing *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 15 (Fla. 3d DCA 1991)).

## B. The Purpose Behind the Civil Remedy Notice Requirement.

Florida's Civil Remedy Notice requirement does not change or alter the totality of the circumstances standard. The CRN requirement exists to give the insurer a final opportunity to engage in good-faith claims handling—not to create a temporal barrier that freezes the substantive bad faith inquiry at a single moment in time. Rather, "the purpose of the CRN is to facilitate and encourage good-faith efforts to timely settle claims before litigation, not to vindicate continuing efforts to delay." *Landers v. State Farm Florida Ins. Co.*, 234 So. 3d 856, 859 (Fla. 5th DCA 2018) (citing *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1272 (Fla. 2000)). *And see Neal v. GEICO Gen. Ins. Co.*, 358 So. 3d 749, 753 (Fla. 4th DCA 2023) (agreeing with *Landers*).

Section 624.155, Florida Statutes, specifies the form and content of the CRN. To be compliant with the statute, the notice must "state with specificity":

1) "[t]he statutory provision, including the specific language of the statute, which the authorized insurer allegedly violated";
2) "[t]he facts and circumstances giving rise to the violation";
3) "[t]he name of any individual involved in the violation";
4) the "specific policy language that is relevant to the violation, if any";
5) "that the notice is given in order to perfect the right to pursue the civil remedy authorized by" section 624.155; and
6) "such other information as the department may require."

§ 624.155(3)(b), Fla. Stat. (2023).

If the insured has given the insurer at least sixty days' notice and stated with specificity these enumerated items, then the insured has complied with his or her "condition precedent to bringing an action under" section 624.155. *See* § 624.155(3)(a). The CRN's cure period provides insurers with "a last opportunity for insurers to comply with their claim-handling obligations when a good-faith decision by the insurer would indicate that contractual benefits are owed." *Talat Enterprises, Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1284 (Fla. 2000).

The point is this: the insured's obligation is to identify the specific statutory violation, the facts then giving rise to that violation, and to give the insurer a defined opportunity to cure. The CRN serves that limited purpose: it triggers a 60-day window in which the insurer must evaluate the claim based on the information that exists at that time. And that is precisely what occurred here: Progressive was presented with a good-faith opportunity to evaluate Collazo's claim during the CRN period and avoid litigation, and it chose not to. *See* DE:92-13 (the CRN).

Nothing in the CRN requirement alters the substantive inquiry into whether an insurer acted in bad faith before or after the CRN. Indeed, "the focus in a bad faith case is not whether the insurer ultimately paid the amounts due under the policy [pursuant to a CRN or otherwise], but whether it acted reasonably in evaluating the claim **prior to the determination of damages**." *Frisco v. State Farm Florida Ins. Co.*, 2D2024-0464, 2025 WL 3466524, at *3 (Fla. 2d DCA Dec. 3, 2025) (quoting *Zaleski v. State Farm Fla. Ins. Co.*, 315 So. 3d 7, 12 (Fla. 4th DCA 2021) emphasis supplied). Which is to say, Florida's bad faith standard does

not ask the trier of fact to determine whether the insurer acted in good or bad faith when it failed to cure the violations in the CRN, but if it did in failing to "settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." § 624.155(1)(b)(1), Fla. Stat. (2023). (Indeed, "[t]he insurer's statutory duty to act in good faith is distinct from its contractual duties to its insured." *Frisco*, 2025 WL 3466524, at *3).

The crux of it is that an insurer's response to a CRN is not dependent upon a final determination of damages; rather, it "is based upon the insurer's good-faith evaluation of what is owed on the insurance contract." *Lugassy v. United Prop. & Cas. Ins. Co.*, 351 So. 3d 23, 26 (Fla. 4th DCA 2022) (quoting *Vest*, 753 So. 2d at 1275). That good faith evaluation must be measured against the totality of the circumstances—not merely the information that happened to exist during the sixty-day window. The CRN "is designed to prevent insurers from playing a 'guessing game' as to what, and how, to cure within the sixty-day window"—nothing more. *Id.* (quoting *King*, 2012 WL 4052271, at *7). It is not designed to insulate insurers from accountability for bad faith conduct by restricting the jury's view to a narrow snapshot of time. Otherwise, insurers would be given carte blanche to violate the bad faith statutes after the expiration of a CRN.

### C. The District Court Exercised its Discretion Consistent with Florida Bad Faith Law.

Progressive's argument that the "relevant time period when assessing whether an insurer acted in bad faith is the 60-day CRN safe-harbor period (and

the insurer's decisions in that period)," *see* Appellant's Brief at 13, inverts the purpose of the CRN requirement. The CRN exists to give insurers an opportunity to cure—not to create an evidentiary shield that bars consideration of how the insurer's evaluation before, during, and after the CRN period compares to the claim's actual value. The insurer's ability to cure exists "to avoid unnecessary bad faith litigation," not as a start and end point to consider the insurer's actions. *Julien v. United Prop. & Cas. Ins. Co.*, 311 So. 3d 875, 878 (Fla. 4th DCA 2021) (quoting *Galante v. USAA Cas. Ins. Co.*, 895 So. 2d 1189, 1191 (Fla. 4th DCA 2005)).

When an insurer declines to cure—as Progressive did here, by offering only $44,200 responsive to a $100,000 policy limit demand—the statutory purpose has been served, and the insured is entitled to pursue the bad faith claim and present evidence bearing on the totality of the circumstances. That's appropriate under Florida's bad faith law, which logically is going to require evidence that comes *before* the 60-day CRN safe-harbor period (there has to be an alleged violation before the CRN is produced to be able to identify the violation on the CRN) and *after* the 60-day CRN safe-harbor period (there has to be an injury for which to seek redress).

Progressive distorts several rulings from federal district courts to reach its preferred conclusion. *See* Appellant's Brief at 14–17.[4] In fact, the cases

[4] Progressive has failed to identify **any** Florida case discussing bad faith law that comes close to adopting its rationale. Nearly all its authority is derived from a
(continued . . .)

Progressive relies upon do not establish any temporal limitation on the evidence relevant to bad faith but instead address a fundamentally different question: whether an insured may pursue *new or distinct* theories of bad faith that were never identified in the operative Civil Remedy Notice. Those cases follow the logically sound conclusion that an insured is required to file a new CRN, identifying the newly relevant violations, prior to suing. But again, that's a fundamentally different situation.

The first example to which Progressive refers is *Kafie v. Nw. Mut. Life Ins. Co.*, 11-21251-CIV, 2011 WL 4499051 (S.D. Fla. Sept. 27, 2011). In *Kafie*, the insured attempted to base a statutory bad faith claim on alleged misrepresentations made by the insurer during settlement negotiations after the verdict in the underlying trial, even though those alleged misrepresentations were not described in the first CRN. *Id*. at *11–12. The district court rejected the insured's argument that "a single CRN … encompasses all later bad faith conduct," explaining that such a rule would "contravene the plain language of the statute," which requires the CRN to state with specificity "[t]he facts and circumstances giving rise to the violation." *Id*. at *11 (quoting § 624.155(3)(b)(2), Fla. Stat.). The point of the ruling was not that the conduct came after the CRN but rather that the conduct was "so attenuated" from the violations originally alleged that it required the filing of another CRN. *Id*. For that reason, the district court dismissed the portion of the

(. . . continued)
smattering of district court rulings made more than a decade ago, prior to the Florida Supreme Court's most recent cases on bad faith law.

claim predicated on the alleged misrepresentations that were not encompassed in the original CRN. *Id*. at *12.

The same situation unfolded in *Fox Haven of Foxfire Condo. IV Ass'n, Inc. v. Nationwide Mut. Fire Ins. Co.*, 2:13-CV-399-FTM-29CM, 2015 WL 667935 (M.D. Fla. Feb. 17, 2015). There, the insured submitted an initial CRN detailing several allegations of bad faith conduct, *see Id*. at *3, but later sought to include evidence that insurer delayed, and only partially paid, an appraisal award that was entered after the original CRN's safe-harbor period. *Id.* at *4. The insurer argued that "this theory of bad faith" sprung to life "long after the expiration of the CRN's 60–day cure period" and thus was outside the scope of the original CRN. *Id.* The district court agreed.

Finally, Progressive points to this Court's unpublished decision in *Bell v. Geico Gen. Ins. Co.*, 489 Fed. Appx. 428 (11th Cir. 2012), which held merely that an insured had failed to comply with the plain language of section 624.155 because their CRN "gave [the insurer] no facts explaining the connection between the delayed … payment to the hospital and the hospital's unresolved lien on the UM claim payment." *Id*. at 432. Similarly, "the CRN is devoid of facts explaining how [the insurer] acted in bad faith by failing to cooperate with [the insureds' attorney] to issue the check to his law firm's trust account upon his assurance that the firm would be responsible for the hospital lien." *Id*. at 433 n.2. The Court concluded that the insureds' "CRN did not afford [the insurer] the opportunity to correct "the

circumstances giving rise to the [alleged] violation." *Id.* at 432. *Bell* is about a deficient CRN and not much else.[5]

Those decisions stand only for the unremarkable proposition that a plaintiff cannot base liability on *separate statutory violations or misrepresentation theories* that were not placed at issue in the CRN. Critically, *Kafie* itself eventually rejected the very rule Progressive now urges. In a later decision, the district court ruled that post-CRN litigation conduct was relevant and actionable where it reflected the same bad faith alleged in the original CRN, explaining that the fact that evidence "occurred after the relevant CRN was filed is of no moment." 834 F. Supp. 2d 1354, 1369 (S.D. Fla. 2011). Where that bad faith conduct "itself is not the basis for the claim identified in the CRN" (like the misrepresentations in the first *Kafie* ruling or the appraisal payment in *Fox Haven*) "but is merely potentially relevant to the bad faith claim, which *is* sufficiently identified," the conduct is admissible and relevant to the totality of the circumstances inquiry. *Id.*

Other Florida cases, while perhaps not directly answering the point, suggest that is the proper view. In *Allstate Indem. Co. v. Ruiz*, 899 So. 2d 1121 (Fla. 2005), the Florida Supreme Court made clear that relevant discovery in bad faith cases involves materials (documents or communications) that were "created up to and including the date of resolution of the underlying disputed matter," placing the

[5] Progressive also conflates several bad faith principles. For example, Progressive cites to several cases which hold that an insured is required to prove a permanent injury during the CRN period to be entitled to extracontractual noneconomic damages. *See* Appellant's Brief at 13–14.

end point of the analysis not at the end of the CRN window but rather at the conclusion of the underlying liability claim. *Id.* at 1129–30. The Court was clear:

> Consistent with the analysis outlined, we hold that in connection with evaluating the obligation to process claims in good faith under section 624.155, all materials, including documents, memoranda, and letters, contained in the underlying claim and related litigation file material that was created up to and including the date of resolution of the underlying disputed matter and pertain in any way to coverage, benefits, liability, or damages, should also be produced in a first-party bad faith action.

*Id.* *And see GEICO Gen. Ins. Co. v. Paton*, 150 So. 3d 804, 807 (Fla. 4th DCA 2014) (holding that the damages in the underlying liability trial are relevant and that the "[the insurer] could have addressed damages in the bad faith trial by arguing that the amount of damages awarded in the first trial could not reasonably have been foreseen, so there was an absence of bad faith.)

In a similar order relied on by the district court here, Judge Middlebrooks of the Southern District of Florida encapsulated the rationale well in *Wopshall v. The Travelers Home and Marine Ins. Co.*:

> Bad faith is determined by evaluating the totality of all circumstances. The post-CRN evidence is relevant. Therefore I will not exclude evidence of communications between the Parties, and/or Defendant's claims handling process after the expiration date of the CRN (December 19, 2017). This ruling is consistent with the purpose of statute. The 60-day window within which the insurer may opt to settle and protect itself from a bad faith lawsuit is not a hard cut-off point for the parties to abandon any effort at resolution of the claim. Therefore, the expiration of the cure window ought not require the insured to discontinue supplementing her claims file with information pertaining to her medical condition when such information may be relevant, nor should it mean that the insurer has no further duty to continue negotiating past the expiration if doing so would be

> appropriate based upon a submission of supplemental information that bears on the value of the claim.

DE:52-1 at 13.

That is the case here. The evidence presented at trial did not introduce new or untethered theories of bad faith beyond those identified in Collazo's CRN. Instead, the evidence presented at trial corroborated and contextualized the very bad faith alleged in the CRN—namely, Progressive's failure to act in good faith in evaluating and settling the claim when it could and should have done so. None of the challenged evidence supplied an independent statutory violation or served as a standalone basis for liability; the evidence merely illuminated the totality of the circumstances bearing on the same alleged failure to settle placed squarely at issue in the CRN.[6]

The district court therefore acted well within its discretion in admitting that evidence consistent with Florida bad faith law.

**(1) The Evidence Submitted at Trial was Consistent with the Allegations of Bad Faith in Collazo's CRN.**

Collazo's Civil Remedy Notice alleged, among other things, that Progressive violated sections 624.155 and 626.9541, Florida Statutes, by:

- "not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for his interests."

---

[6] Progressive overstates that "Collazo's argument at the bad faith trial sought a strict liability standard against an insurer if an excess verdict is returned." Appellant's Brief at 22. Collazo did not argue that at any point during trial.

- "failing to promptly settle claims, when the obligation to settle a claim has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage."
- "[d]enying claims without conducting reasonable investigations based upon available information"
- "[f]ailing to acknowledge and act promptly upon communications with respect to claims."

DE:92-13 at 2.

The CRN set forth specific factual allegations concerning Collazo's injuries, the medical evidence supporting his claim, and Progressive's failure to pay the policy limits despite that evidence. DE:92-13 at 3. The trial evidence confirmed each of these allegations and demonstrated that the claim's value always exceeded Progressive's $44,200 offer.

**I.**

The CRN alleged that Faris Hillaire rear-ended Collazo's vehicle on June 27, 2019, and that under Florida law, the rear driver in such a collision is presumed negligent. DE:92-13 at 3. At trial, the evidence established these facts, and the underlying UM jury found that Collazo's injuries were caused by this accident. DE:123-1 at 86–87, 130–131, 167–168.

The CRN alleged that Collazo "sustained permanent injuries" to his cervical and lumbar spine. DE:92-13 at 3. The CRN specifically detailed that MRI imaging from September 19, 2019, revealed "central disc herniation at C4-5,"

"broad based disc bulge," and "central disc herniation and subtle left paracentral annular tear" in the lumbar spine. DE:92-13 at 3. This medical evidence was in Progressive's possession during the CRN cure period. At trial, the underlying jury confirmed these allegations by finding that Collazo sustained a permanent injury caused by the June 27, 2019, accident. DE:123-1 at 86–87, 130–131, 167–168.

**II.**

The CRN alleged that Collazo's medical expenses exceeded $145,000 as of the filing date and that he would "certainly incur more in the future for continued management." DE:92-13 at 3-4. The CRN documented Collazo's treatment progression, including chiropractic care, MRI studies, injection therapy, and radiofrequency ablation procedures performed in May 2020. DE:92-13 at 3. At trial, the evidence showed that Progressive had received and reviewed these medical records and bills. DE:92-9; DE:123-1 at 120–122, 171–174. The underlying UM jury awarded Collazo $252,000.18 in past medical expenses—validating that his medical costs were both reasonable and causally related to the accident. DE:123-1 at 235–236. The jury also awarded $150,500 in future medical expenses, confirming the CRN's allegation that Collazo would require ongoing care. *Id.*

**III.**

The CRN alleged that Collazo "endured pain and suffering and will continue to do so into the future" and that he "incurred additional noneconomic damages in the form of loss of the enjoyment of life and inconvenience due to his injuries." DE:92-13 at 4. The underlying jury award confirmed these allegations, awarding $274,150 in past pain and suffering and $167,507 in future pain and suffering—totaling $441,657 in noneconomic damages. DE:123-1 at 235–236.

**IV.**

The CRN alleged that Progressive "has not attempted in good faith to settle Collazo's claim and has made offers far less than the value of his claim" and that "Progressive has refused to pay the policy limits." DE:92-13 at 4. The trial evidence confirmed that Progressive offered only $44,200 during the CRN cure period—less than half of its $100,000 policy limits. DE:92-10. This offer was made against documented medical expenses exceeding $145,000 and MRI-confirmed disc herniations and annular tears. The ultimate verdict of $844,220.18—more than eight times the policy limits—demonstrated that Collazo's $100,000 policy limits demand was not only reasonable but substantially undervalued his actual claim. DE:123-1 at 86–87.

**V.**

In sum, every material allegation in Collazo's CRN was substantiated by trial evidence that occurred during the operative claims handling period. The CRN alleged permanent injuries from disc herniations; the evidence showed permanent injury. The CRN alleged medical expenses exceeding $145,000; the evidence

showed the past medical expenses. The CRN alleged that Progressive's offers were "far less than the value of his claim"; the evidence showed that offers were unreasonable given the evidence. The trial evidence did not introduce new or unexpected allegations of bad faith conduct but instead proved what Collazo had alleged from the outset: that Progressive failed to settle a claim it could and should have settled, had it acted fairly and honestly toward its insured.

**(2) The "Post-CRN Evidence" Reflected a Natural Evolution of the Conditions Alleged in Collazo's CRN.**

The question in a bad faith trial is not whether post-CRN evidence exists or is admissible, but what that evidence shows about the insurer's conduct at the time it chose not to settle. As Florida's Fourth District Court of Appeal has explained, an insurer is not prejudiced by the admission of such evidence because it remains free to contest foreseeability before the jury: "[the insurer] could have addressed damages in the bad faith trial by arguing that the amount of damages awarded in the first trial could not reasonably have been foreseen, so there was an absence of bad faith." *Paton*, 150 So. 3d at 807. That is precisely how the bad faith trial functioned here.

Collazo presented evidence that the medical conditions identified in his CRN naturally progressed into the later treatment and damages—consequences he contended were foreseeable when the CRN was filed and formed the basis for valuing the claim in excess of the policy limits. Progressive, in turn, was free to argue that those developments were not foreseeable. The jury was entitled to resolve that dispute. Because the evidence bore directly on foreseeability and the

reasonableness of Progressive's settlement conduct, it was probative of bad faith and properly considered as part of the totality of the circumstances.

That is exactly how the post-CRN evidence was used at trial.

As *Paton* makes clear, an insurer may "address[] damages in the bad faith trial by arguing that the amount of damages awarded in the first trial could not reasonably have been foreseen, so there was an absence of bad faith." 150 So. 3d at 807. Progressive did precisely that, examining its corporate representative to establish that the recommendation for lumbar surgery—and the damages associated with it—were not reasonably foreseeable at the time the CRN was filed. The following exchange illustrates Progressive's use of the post-CRN evidence for that exact, permissible purpose:

> Q. And, based on your review of the file, did you see any indication that Progressive had been previously -- the fact that the UM claim previously provided any indication that Mr. Collazo was going to be undergoing neck surgery?
>
> A. No.
>
> …
>
> Q. And, with respect to any claim for future medical expenses, do you have any understanding of whether Mr. Collazo presented evidence to the jury, at that point, of needing other surgical procedures in the future?
>
> A. Yes, there was.
>
> Q. Do you remember what?
>
> A. Yes, it was to the lumbar spine.
>
> Q. And, that was an additional surgical procedure?

A. A recommendation for one that had not occurred yet.

Q. Based on your review of Progressive's files, as it relates to the UM claim, did you see any indication before June of 2021, when Progressive offered the policy limits, that it had information that Mr. Collazo was going to be undergoing a lumbar surgery?

A. No.

Q. Did you see anything in the file that provided Progressive, with respect to the UM claim, an indication that lumbar surgery was recommended at any point before that June 2021 offer?

A. No.

*Compare Paton*, 150 So. 3d at 807 *with* DE:123-1 at 201–203.

That's how the bad faith trial is supposed to play out. Progressive, instead, pursued a shortcut by seeking to exclude virtually any information arising after the CRN cure period expired on October 26, 2020. But the timeliness of the information is "of no moment." *Kafie*, 834 F. Supp. 2d at 1369. That conduct "is merely potentially relevant to the bad faith claim, which is sufficiently identified" by Collazo's CRN. *Id.*

And to be sure, the post-CRN evidence did not reflect new or unforeseen allegations of bad faith. Rather, the evidence was simply the natural continuation and clinical progression of the injuries and conditions expressly identified in Collazo's CRN. Progressive's assertion that these developments were not "known by, suggested to, or even hinted to" during the cure period mischaracterizes the record. Appellant's Brief at 6.

The post-CRN evidence—including resumed treatment, cervical surgery, the recommendation for lumbar surgery, and increased medical expenses—did not

introduce new theories of liability but instead confirmed the severity, permanence, and trajectory of the very injuries documented in the CRN and underlying the allegations of Progressive's bad faith conduct.

Recall, the CRN specifically alleged and provided Progressive with medical records establishing that Collazo suffered structural spinal injuries, including MRI-confirmed disc herniations and annular tears. The CRN detailed that MRI imaging revealed a "central disc herniation at C4-5," a "broad based disc bulge," a "broad-based central disc herniation and subtle left paracentral annular tear," and a "reduction of the normal lordotic curvature likely due to sprain/strain injury coupled with muscle spasm." DE:92-13 at 3. These findings reflect permanent structural abnormalities of the spine—conditions Progressive knew, or should have known, frequently require surgical intervention when conservative care fails.

The CRN also documented a failed course of conservative treatment, not improvement. It chronicled escalating treatment beginning with chiropractic care, progressing to diagnostic nerve blocks, cervical medial branch blocks, and culminating in bilateral radiofrequency ablations in May 2020. DE:92-13 at 3. The CRN expressly stated that Dr. Popinchalk "noted Mr. Collazo failed conservative care and injection therapy" before recommending ablation. *Id*. That progression placed Progressive on notice that Collazo's treatment was ongoing and unresolved—and that more invasive intervention was foreseeable if ablation failed. Consistent with that notice, the CRN expressly warned that Collazo "is still follow[ing] up with his treating physicians" and that his permanent injuries "will certainly incur more [medical expenses] in the future for continued management."

DE:92-13 at 3–4. Progressive chose to value the claim as though the ablation procedures had resolved the underlying pathology—a gamble which was not borne out by the subsequent events (which the jury was entitled to hear about).

At trial, Collazo's testimony that after "a few months" of temporary relief, his pain returned, was consistent with the CRN allegations which showed the exact same pattern of treatment, temporary relief, and recurring pain. DE:123-1 at 84–85. As Collazo argued to the jury, the cervical surgery and the recommendation for lumbar surgery were not new injuries or unrelated developments; they were the foreseeable treatment for the very spinal injuries disclosed in the CRN. DE:92-13 at 3; DE:123-1 at 84–85.

Progressive's own conduct confirmed foreseeability. When it learned of the cervical surgery and lumbar surgery recommendation in June 2021, Progressive did not dispute causation or necessity. Instead, it immediately tendered the full $100,000 policy limits. DE:123-1 at 201. That response is irreconcilable with Progressive's *bold* claim of surprise (literally, *see* Appellant's Brief at 6, 7, 16, 18, 23) and demonstrates its recognition that the post-CRN developments were the natural consequence of the injuries it had evaluated all along.

At bottom, the post-CRN evidence did not alter the nature of Collazo's claim—it merely confirmed the severity of the allegations made in the operative CRN. Progressive was free to argue that the evidence was unforeseeable at the time, which it did, and the jury was free to reject that argument, which it did.[7]

---

[7] Progressive's passing argument that the district court erred in denying its requested special jury instructions on damages calculation and permanency
(continued . . .)

**(3) The Underlying UM Verdict was Relevant.**

Progressive's insistence that the jury should have been precluded from considering the underlying UM verdict also misunderstands Florida's totality of the circumstances standard. The verdict was not offered to relitigate damages or to inject hindsight bias at trial; rather, it was relevant because it represented the most concrete, objective confirmation of the very risk Progressive was obligated to evaluate and guard against. Florida bad faith law is premised on the insurer's fiduciary duty to act with due regard for the insured's interest in avoiding exposure to an excess judgment. *See generally Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6–7 (Fla. 2018); *Cope*, 462 So. 2d at 460.

That duty cannot be assessed in the abstract. As the Florida Supreme Court has made clear, the "essence" of a bad faith action is that the insurer's failure to act in good faith resulted in the insured being exposed to liability beyond the policy limits. *Cope*, 462 So. 2d at 460; *Berges*, 896 So. 2d at 679. The excess verdict is therefore not collateral to the liability inquiry—it is the injury that defines it. A jury charged with deciding whether the insurer failed to settle "under all the circumstances" cannot do so without understanding the magnitude of the insured's exposure. *Berges*, 896 So. 2d at 680.

---

(. . . continued)
(Appellant's Brief at 7–8, 33 n.3) provides no basis for reversal. The argument is not preserved in a footnote and, in any event, the district court gave the standard Florida bad faith jury instruction, which encapsulated the proper standard. DE:80 at 25. Progressive's requested instructions would have injected unnecessary complexity into a straightforward inquiry and were properly refused.

Without knowing that Collazo's damages were ultimately determined to exceed the policy limits, the jury would have been left to assess Progressive's settlement conduct based solely on the insurer's asserted beliefs, untethered from whether those beliefs were objectively reasonable in light of the risk the claim actually posed. Florida law rejects that subjective framing. An insurer must "use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business," and that standard is evaluated objectively, not through the insurer's self-described mindset. *See Harvey*, 259 So. 3d at 6–7 (quoting *Berges*, 896 So. 2d at 677).

Florida bad faith precedent recognizes that an underlying verdict plays a central role in bad faith litigation precisely because it establishes the insured's true exposure. In *Fridman v. Safeco Insurance Co. of Illinois*, the Florida Supreme Court explained that a verdict fixing the extent of the insured's damages "provide[s] a basis to award damages in the inevitable bad faith action the insurer foresaw on the horizon." 185 So. 3d 1214, 1224 (Fla. 2016). That logic applies with equal force here: the verdict confirming that Collazo's damages exceeded the policy limits informed the jury's evaluation of whether Progressive's pre-verdict handling of the claim comported with its duty to protect its insured.

More recently, Florida's Second District Court of Appeal confirmed that the underlying excess verdict is not merely relevant but central to the bad faith inquiry because the jury must determine whether the insurer's conduct caused the insured's exposure to that verdict. *See Hancock v. Florida Farm Bureau Gen. Ins. Co.*, 421 So. 3d 459 (Fla. 2d DCA 2025). The jury in *Hancock* was expressly tasked with

deciding whether the insurer's bad faith conduct "caused the excess judgment," and the Second District affirmed that framework as consistent with Florida bad faith law. *Id.* at *4–6. That analysis necessarily presupposes that the jury is aware of the existence and magnitude of the excess judgment itself, because the fact of that judgment is the injury the jury must assess causation against.

Nor does admission of the verdict improperly inject hindsight. Progressive remained free to address "damages in the bad faith trial by arguing that the amount of damages awarded in the first trial could not reasonably have been foreseen, so there was an absence of bad faith." *Paton*, 150 So. 3d at 807. That's the crux of a bad faith trial: the insured presents its damages (the excess verdict) and evidence of bad faith (the violations) while the insurer argues that the verdict was not foreseeable based on the evidence it was provided by the insured. Questions about foreseeability of the verdict go to weight, not admissibility. But Florida's totality of the circumstances standard does not permit the jury to be shielded from the very outcome the insurer was duty-bound to prevent.

Progressive relies on a district court ruling which excluded the existence of the underlying motorist verdict from trial that has since been approved by this Court in *Woods v. Progressive Am. Ins. Co.*, 159 F.4th 837 (11th Cir. 2025). Appellant's Brief at 30–31. But the Court in *Woods* evaluated the district court's exercise of discretion, and determined that it was not an abuse of discretion under the circumstances of that case. *Woods*, 159 F.4th at 843. And it was significant in *Woods* that the insured "chose to narrow her theory of bad faith liability by stipulating that Progressive's alleged bad faith conduct ended before the

underinsured motorist trial began…. [which] eliminated any connection between [the insurer's] alleged bad faith conduct and the later excess judgment." *Id.* The Court concluded that once the insurer "confined her theory of bad faith to conduct before the underinsured motorist trial, the jury verdict and excess judgment entered after trial were no longer part of the 'totality of the circumstances' surrounding [the insurer's] claims handling." *Id.* That's a meaningful distinction from this case.

Here, no such stipulation was made. To the contrary, this case presents the inverse posture, in which the district court exercised its discretion to admit the evidence as part of the totality of the circumstances surrounding Progressive's claims handling. Because the standard of review is deferential, the question is not whether a different evidentiary ruling could also have been reasonable, but whether the ruling made was within the range of permissible choices. Under that standard, there is no inconsistency in concluding that both the exclusion approved in *Woods* and the admission at issue here were reasonable exercises of discretion based on the distinct theories and evidentiary postures of the respective cases.

In short, the district court's ruling was reasonable here because the underlying UM verdict was relevant here not because it fixed damages, but because it illuminated the stakes of Progressive's decision-making. Florida bad faith law requires an evaluation of whether the insurer acted with due regard for the insured's interests in avoiding an excess judgment. *Harvey*, 259 So. 3d at 6–7; *Berges*, 896 So. 2d at 679–80. The verdict establishing that exposure was therefore central—not incidental—to the jury's assessment of bad faith under the

totality of the circumstances and district court properly exercised his discretion based upon that consideration.

**(4) Any Error Was Harmless and Not Manifestly Erroneous.**

As a final thought, even if this Court were to conclude that the district court erred in admitting the post-CRN evidence and the underlying verdict amount (which it should not) any such error in denying Progressive's motion in limine or motion for new trial was harmless. The record evidence of Progressive's conduct during the CRN period alone was more than adequate to support the jury's finding that Progressive acted in bad faith by failing to settle Collazo's claim when it could and should have done so. "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is grounds for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." Fed. R. Civ. P. 61. To warrant reversal, Progressive "bears the burden of proving that the error probably had a substantial influence on the jury's verdict." *Proctor v. Fluor Enterprises, Inc.*, 494 F.3d 1337, 1353 (11th Cir. 2007). Progressive cannot meet that burden here.

The CRN-period evidence, standing alone, established bad faith. By the time the CRN cure period expired on October 26, 2020, the jury heard uncontradicted evidence that:

- Progressive's claim file contained September 2019 MRI findings documenting disc herniations at two spinal levels—cervical and lumbar. DE:123-2 at 131–32.

- Dr. Narson had opined, to a reasonable degree of certainty, that Collazo's injuries were permanent. DE:123-1 at 218–20; DE:123-2 at 45–46.
- Progressive's own Level 48 adjuster (its most experienced) reviewed the file and concluded that Collazo "has a permanent injury" and that "the threshold was met." DE:123-2 at 45–46, 131–32.
- Medical records sent to Progressive warned that Collazo's condition would "worsen and have further disabling effects" over time. DE:123-1 at 129–32.
- Progressive internally set reserves at $100,000 (the full policy limits) while offering only $44,200. DE:123-2 at 130–31; DE:123-1 at 206.
- Progressive had no contrary medical evidence. There was "no IME as to his herniations in his neck, his herniations in lumbar." DE:123-1 at 159. Progressive's corporate representative admitted: "Progressive has no medical or professional opinion that counteracts the treating physician's information being given." DE:123-1 at 157–58.

This evidence alone presented an overwhelming case for bad faith.

Progressive internally valued the claim at policy limits while offering less than half that amount to its own insured. Progressive possessed uncontradicted medical evidence of permanent spinal injuries and warnings that those injuries would worsen. Progressive's own most experienced adjuster confirmed that Collazo had a permanent injury. Yet, despite all that, Progressive offered only $44,200. The jury did not need the post-CRN evidence or the underlying verdict to conclude that this conduct constituted bad faith.

The post-CRN evidence was cumulative, not transformative. The cervical surgery, the lumbar surgery recommendation, and the underlying verdict did not supply the basis for liability—they merely confirmed the severity, permanence, and trajectory of injuries that were already documented in Progressive's file during the CRN period. The jury could have reasonably concluded that Progressive's failure to account for Collazo's documented permanent injuries and future medical needs constituted bad faith, irrespective of Progressive's post-CRN conduct or the eventual verdict amount.[8]

Excluding the challenged evidence, the result would have remained unchanged.[9] The CRN-period evidence was independently sufficient to establish bad faith. The post-CRN evidence and underlying verdict amount, while relevant under the totality of circumstances standard, were not necessary to the verdict. Progressive has not shown—and cannot show—that the admission of this evidence "probably had a substantial influence on the jury's verdict." *Proctor*, 494 F.3d at 1353. Any error was therefore harmless.

---

[8] Indeed, the post-CRN evidence may have helped Progressive's defense by allowing it to argue that the surgical developments were unforeseeable. Progressive's corporate representative testified about Progressive's lack of knowledge regarding the later surgery recommendations. DE:123-1 at 201–03. Without the post-CRN evidence, the jury would have focused exclusively on what Progressive knew during the CRN period—and that evidence was damning.

[9] Progressive's own conduct also undermines any claim of prejudice. Progressive relied on post-CRN evidence throughout trial as part of its defense, arguing that it tendered the policy limits immediately upon learning of the cervical surgery. DE:123-1 at 201–02. Progressive cannot be unfairly prejudiced by evidence it affirmatively used in its own defense.

## CONCLUSION

The Court should affirm the Final Judgment in all respects.[10]

Respectfully submitted,


Elliot B. Kula
Florida Bar No. 03794
William D. Mueller
Florida Bar No. 120124
KULA & ASSOCIATES, P.A.
12000 Biscayne Blvd., Ste. 221
Miami, Florida 33181
Telephone: (305) 354-3858
Facsimile: (305) 354-3822
eservice@kulalegal.com
elliot@kulalegal.com
william@kulalegal.com

Stephen A. Marino, Jr.
Florida Bar No. 79170
Rochelle Wimbush
Florida Bar No. 74200
VER PLOEG & MARINO, P.A.
100 S.E. Second St., Ste. 3300
Miami, Florida 33131
Telephone: (305) 577-3996
Facsimile: (305) 577-3558
smarino@vpm-legal.com
rwimbush@vpm-legal.com

By: /s/ Elliot B. Kula
Elliot B. Kula

By: /s/ William D. Mueller
William D. Mueller

By: /s/ Stephen A. Marino, Jr.
Stephen A. Marino, Jr.

By: /s/ Rochelle Wimbush
Rochelle Wimbush

*Co-Counsel for Plaintiff-Appellee*


[10] Progressive's request for certification to the Florida Supreme Court should be denied. The totality of the circumstances standard governing bad faith claims is well-settled under Florida law, and Progressive has identified no conflict among Florida's district courts of appeal warranting Supreme Court resolution. *See Berges*, 896 So. 2d at 680. Progressive's dissatisfaction with the application of that standard to the facts of this case does not present an unsettled question of law suitable for certification.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief uses Times New Roman 14-point typeface and contains 11,156 words.

/s/ **Elliot B. Kula**
Elliot B. Kula

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 2, 2026, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system. I also hereby certify that the foregoing document is being served this day on all counsel of record identified on the Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ **Elliot B. Kula**
Elliot B. Kula